Douglas Edward **GRETZLER,**
**Petitioner–Appellant,**

v.

Terry L. **STEWART, Director, of the Arizona Department of Corrections, Respondent–Appellee.**

No. 95–99023.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 27, 1996.

Decided April 30, 1997.

994

Cary Sandman and James W. Stuehringer, Waterfall, Economidis, Caldwell, Hanshaw & Villamana, Tucson, AZ, for petitioner-appellant.

Crane McClennen, Assistant Attorney General, Phoenix, AZ, for respondent-appellee.

Before: FARRIS, PREGERSON, and LEAVY, Circuit Judges.

LEAVY, Circuit Judge.

Douglas Edward Gretzler, an Arizona prison inmate currently under a state court sentence of death, appeals from the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. We have jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1291 and 2253, and we affirm.[1]

## FACTS AND PRIOR PROCEEDINGS

The relevant underlying facts are largely undisputed and were adequately summarized by the Supreme Court of Arizona:

> In late December of 1972, Gretzler abandoned his wife and infant daughter in New York City, leaving no word of his intentions or whereabouts. He drove to Casper, Wyoming, and then to Denver, Colorado, where he met and moved in with Willie Steelman and Steelman's sister. At this point, Gretzler's criminal record consisted of minor traffic charges and one count of vagrancy.
>
> On 11 October 1973, Gretzler, Steelman and a woman friend left Denver for Phoenix, Arizona. In Globe, Arizona, the two men committed an armed robbery of a sunbathing couple; the robbery netted them five dollars. Later on the same day, they picked up a hitchhiker, tied him to a tree and stole his clothes, a ring and twenty dollars. On 15 October, the trio arrived in Phoenix where they pawned the ring and robbed a woman of twenty dollars and some checks.
>
> Shortly after the trio's arrival in Phoenix, the woman set forth on her own. Steelman and an Arizona acquaintance known as "Preacher" went out to settle a drug-related dispute involving Preacher's brother. Both Preacher and his brother died in the resulting melee.
>
> Through two young men, Ken Unrein and Mike Adshade, Gretzler and Steelman learned that acquaintances of Steelman named Bob Robbins and Yafah Hacohen were living at an area trailer park. All four visited the couple. Following the visit, Gretzler and Steelman kidnapped Unrein and Adshade in their Volkswagen van and drove to Stanislaus County, California, where, on 17 October 1973, the pair garroted and stabbed Unrein and Adshade to death. They hid the bodies and continued to drive the Volkswagen until it stopped running, at which point they began to hitchhike. On 20 October, they kidnapped a young couple who stopped for them near Petaluma, California. Steelman raped the woman captive, but eventually both victims were released at an underground garage, where Gretzler and Steelman stole another car.
>
> Concerned that Bob Robbins and Yafah Hacohen would eventually connect them with the disappearance of Unrein and Adshade, Gretzler and Steelman decided to return to Arizona and silence the couple. On the way to Phoenix, they picked up a hitchhiker named Steve Loughren. The three stayed overnight with Robbins and Hacohen; the following evening, Gretzler and Steelman murdered Loughren in an isolated area near the Superstition Mountains. They then returned to their friends' trailer. On 25 October, while Hacohen was at work, they garroted and shot Robbins to death and hid his body. When Hacohen returned home, she, too, was murdered.
>
> Gretzler and Steelman then moved on to Tucson where they shared a "crash pad" with some local street people. On 2 November, while hitchhiking with some of their Tucson acquaintances, they were picked up by Gilbert Sierra, whom they murdered later that night. They drove the victim's car to a parking lot, where they wiped their fingerprints off the vehicle and abandoned it.

---

**1.** We had previously directed the parties to brief the issue of whether the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (the "Act") applied to this appeal. That question has now been answered in the negative. *See Jeffries v. Wood,* 103 F.3d 827, 827 (9th Cir.1996).

On 3 November, Gretzler and Steelman kidnapped Vincent Armstrong who stopped for them while they were again hitchhiking. Armstrong escaped from his moving car and notified police of his abduction and the theft of his vehicle. His captors drove his Pontiac Firebird to a Tucson condominium complex, where Michael Sandberg was washing his white Datsun in the parking lot. They parked the Firebird in an inconspicuous corner of the lot and forced Sandberg to take them to his condominium where his wife Patricia was studying. While in the Sandbergs' home, Gretzler dyed his blond hair to brown. Both he and Steelman changed from jeans to slacks and coats belonging to Michael Sandberg. They bound and gagged both hostages, Michael on his bed and Patricia on the living-room couch. When night fell, Gretzler shot Michael in the head, muffling the gun with a pillow. He then shot Patricia, who was entirely covered by a blanket. Steelman took the gun and fired one more shot into her body, to make certain she was dead. The two then wiped down the condominium in an attempt to eliminate their fingerprints, gathered together credit cards, checks, a camera and other items belonging to the Sandbergs, and drove away in the couple's car.

They went to the place where they had arranged to meet acquaintances with whom they planned to drive to California. The only person at the meeting-place was Donald Scott, and the three set off together. Scott knew that he was riding in a stolen car, and he testified that he saw Steelman pay for motel rooms and automobile service with Michael Sandberg's American Express card. However, Scott apparently was unaware of his companions' other crimes. He had been told by then that he was free to leave them if things became "too much" for him. Scott did leave when Gretzler and Steelman stopped for gas in Pine Valley, California. The two continued to Lodi, California, where they entered the home of the Walter Parkin family and took as hostages all present, as well as others who arrived later. Gretzler and Steelman forced Parkin to open the safe in his nearby store and stole between $3,000 and $4,000, of which Gretzler's share was about half. Afterwards, Gretzler shot to death seven adults, whom he had previously bound and gagged. He went to a bedroom where Steelman had pulled a blanket over the heads of two sleeping children, shot one of them to death and waited while Steelman shot the second.

*State v. Gretzler*, 126 Ariz. 60, 612 P.2d 1023, 1028–30 (1980).

A few days later, Gretzler and Steelman were arrested in California as suspects in the Parkin homicides. Upon learning from California authorities that Gretzler and Steelman had been driving a car registered to Michael Sandberg, Tucson police went to the Sandberg home where they discovered the couple's bodies. Shortly thereafter, Gretzler confessed to the murders of Michael and Patricia Sandberg.

Gretzler pleaded guilty in California to nine counts of first degree murder for the Parkin killings, for which he was sentenced to nine concurrent terms of life imprisonment. He and Steelman were then extradited to Arizona to stand trial for the murders, burglary and robbery of Michael and Patricia Sandberg, and for the kidnapping and robbery of Vincent Armstrong. The jury found Gretzler guilty on all counts.[2] He was sentenced to death for the two murders, and to concurrent terms of imprisonment, ranging from twenty-five to fifty years, on the remaining counts.

The Arizona Supreme Court affirmed Gretzler's convictions on all counts, upheld his sentences on the kidnapping, robbery and burglary counts, but remanded for resentencing on the two murder counts. *State v. Gretzler*, 612 P.2d at 1055. On remand, the trial court found as aggravating circumstances that (1) Gretzler had nine prior convictions punishable by either death or life imprisonment in Arizona, (2) these nine prior

---

2. Steelman was tried separately and convicted on all counts. *State v. Steelman*, 120 Ariz. 301, 585 P.2d 1213 (1978), *appeal following remand,* 126 Ariz. 19, 612 P.2d 475, *cert. denied,* 449 U.S. 913, 101 S.Ct. 287, 66 L.Ed.2d 141 (1980).

convictions were for crimes of violence, (3) the two Arizona murders had been committed for pecuniary gain, and (4) the killings were especially heinous, cruel, or depraved. The court found as a mitigating circumstance that Gretzler had a significantly impaired capacity to appreciate the wrongfulness of his conduct and/or to conform his conduct to the requirements of the law, but rejected Gretzler's contention that the mitigating circumstance was substantial enough to warrant a call for leniency. The court resentenced Gretzler to death on both counts. The sentences were affirmed on appeal. *State v. Gretzler*, 135 Ariz. 42, 659 P.2d 1, *cert. denied*, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

Gretzler filed a petition for post-conviction relief ("PCR") in state court in 1983. Following a hearing with oral argument, the trial court denied relief in 1984, and rejected Gretzler's request for rehearing in 1985. After the Arizona Supreme Court denied review, Gretzler filed a second PCR (subsequently amended) in state court. Shortly thereafter, Gretzler filed the instant petition for federal habeas relief. The district court stayed its proceedings pending resolution of Gretzler's second PCR. In 1986, the state court denied relief and rehearing in the second PCR, and the Arizona Supreme Court denied review in 1987.

The district court lifted its stay in 1987, and granted a motion for partial summary judgment in favor of the respondent the following year. The court again stayed the proceedings, this time pending resolution of the appeal in *Adamson v. Ricketts*, 865 F.2d 1011 (9th Cir.1988) (en banc), *cert. denied sub nom. Lewis v. Adamson*, 497 U.S. 1031, 110 S.Ct. 3287, 111 L.Ed.2d 795 (1990). The district court lifted its second stay in 1991, and Gretzler filed an amended petition for writ of habeas corpus in 1992. In his amended petition, Gretzler raised a total of twenty-six issues. Following additional briefing by the parties and a review of the complete state court record, the district court granted the respondent's motion for summary judgment and dismissed Gretzler's amended petition in 1995. Gretzler has timely appealed.

## ANALYSIS

### *Standard of Review*

 A district court's decision to grant summary judgment in favor of the state respondent in a federal habeas petition is subject to de novo review. *Ceja v. Stewart*, 97 F.3d 1246, 1249 (9th Cir.1996).

### *Discussion*

Gretzler asserts the following issues on appeal, each of which will be discussed in turn:

(1) The trial court violated Gretzler's Eighth and Fourteenth Amendment rights when it denied him access to psychiatric experts needed to assist with the defense;

(2) Gretzler was denied his Sixth Amendment right to the effective assistance of counsel when his lawyer failed to pursue a psychiatric or drug intoxication defense;

(3) The trial court violated Gretzler's Fifth, Sixth, and Fourteenth Amendment rights when it admitted statements Gretzler had made to the California authorities after invoking his *Miranda* rights;

(4) The trial court violated Gretzler's Eighth Amendment rights when it considered Gretzler's California guilty pleas to nine counts of first degree murder as death penalty aggravating factors;

(5) The trial court and the Arizona Supreme Court violated Gretzler's Eighth and Fourteenth Amendment rights when they considered an unconstitutionally vague circumstance as a death penalty aggravating factor;

(6) The trial court and the Arizona Supreme Court violated Gretzler's Fifth Amendment protection against double jeopardy when they considered his California convictions as two death penalty aggravating factors;

(7) The trial court violated Gretzler's Eighth and Fourteenth Amendment rights when it failed to require proof of the existence of aggravating factors beyond a reasonable doubt;

(8) The Arizona Supreme Court violated Gretzler's Eighth Amendment rights when

it considered non-statutory aggravating factors in its review of Gretzler's sentence;

(9) The trial court violated Gretzler's Eighth and Fourteenth Amendment rights when it considered a pro-death penalty statement from the father of one of the victims; and

(10) The trial court violated Gretzler's Fourteenth Amendment rights when it engaged in *ex parte* communication with a deputy prosecutor concerning publicity surrounding the death penalty.

### I. Access to Psychiatric Experts

#### A. New Rule/Retroactive Application

Citing *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), Gretzler argues that he was deprived of his Eighth and Fourteenth Amendment rights when the trial court denied him the assistance of a qualified psychiatrist to help with his defense. *Ake* holds, in relevant part, that

> when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

470 U.S. at 83, 105 S.Ct. at 1096.

■ Although his Arizona trial and conviction antedate *Ake* by ten years, Gretzler insists that *Ake* should nevertheless apply to the facts of his case because the Supreme Court's holding did not represent a new rule. "A decision announces a new rule 'if the result was not *dictated* by precedent existing at the time the defendant's conviction became final.'" *Harris v. Vasquez*, 949 F.2d 1497, 1518 (9th Cir.1991) (as amended; quoting *Penry v. Lynaugh*, 492 U.S. 302, 314, 109 S.Ct. 2934, 2944–45, 106 L.Ed.2d 256 (1989); emphasis in original), *cert. denied*, 503 U.S. 910, 112 S.Ct. 1275, 117 L.Ed.2d 501 (1992). "[O]ur task is to determine whether a state court considering [Gretzler's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [Gretzler] seeks was required by the Constitution." *Saffle v. Parks*, 494 U.S. 484, 488, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415 (1990).

■ Gretzler's contention that *Ake* did not announce a new rule, but was instead a logical and predictable extension of existing constitutional principles, finds no support in the law. *See United States ex rel. Smith v. Baldi*, 344 U.S. 561, 568, 73 S.Ct. 391, 394–95, 97 L.Ed. 549 (1953) (state had no constitutional duty, even upon defense request, to appoint psychiatrist for pretrial examination of defendant's sanity). As we noted in *Harris*, "Up to that time [i.e., prior to 1985], without *Ake*, a state court had no reason to conclude that a criminal defendant had a constitutional right to state-funded psychiatric assistance at any stage of a criminal proceeding." 949 F.2d at 1518. Accordingly, we reject Gretzler's contention that *Ake* did not constitute a new rule.

■ Gretzler argues in the alternative that, even if *Ake* did announce a new rule, that rule should apply retroactively. "Under *Teague* [ *v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) ], new rules will not be applied ... in cases on collateral review unless they fall into one of two exceptions." *Graham v. Collins*, 506 U.S. 461, 467, 113 S.Ct. 892, 897, 122 L.Ed.2d 260 (1993). This restriction against the retroactive application of new rules governs capital as well as non-capital cases. *Id.*

■ "The first exception to *Teague* permits retroactive application of a new rule that places a class of private conduct beyond the state's power to prohibit or addresses a substantive categorical constitutional guarantee, such as a rule prohibiting a certain category of punishment." *Harris*, 949 F.2d at 1519. The first exception is clearly inapposite.

■ "The second exception is for 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle*, 494 U.S. at 495, 110 S.Ct. at 1264 (quoting *Teague*, 489 U.S. at 311, 109 S.Ct. at 1075–76). This exception is meant to apply to those procedures without which the accuracy of a conviction would be seriously diminished. *Butler v.*

*McKellar,* 494 U.S. 407, 416, 110 S.Ct. 1212, 1218, 108 L.Ed.2d 347 (1990). As the Supreme Court recently noted,

> Whatever the precise scope of this exception, it is clearly meant to apply only to a small core of rules requiring observance of those procedures that ... are implicit in the concept of ordered liberty. As the plurality cautioned in *Teague,* because we operate from the premise that such procedures would be so central to an accurate determination of innocence or guilt, we believe it unlikely that many such components of basic due process have yet to emerge.

*Graham,* 506 U.S. at 478, 113 S.Ct. at 903 (citations and quotations omitted).

 We are not convinced that the right to psychiatric assistance as expounded in *Ake* is a "watershed rule of criminal procedure" lying in that "small core of rules" that are "implicit in the concept of ordered liberty." The only Court of Appeals to squarely decide the issue has reached the same conclusion. *See Bassette v. Thompson,* 915 F.2d 932, 938–39 (4th Cir.1990) (*Ake* not retroactive; second *Teague* exception does not apply), *cert. denied,* 499 U.S. 982, 111 S.Ct. 1639, 113 L.Ed.2d 734 (1991); *see also Stewart v. Gramley,* 74 F.3d 132, 134 (7th Cir.) (*Ake* not retroactive) (dictum), *cert. denied,* —— U.S. ——, 117 S.Ct. 113, 136 L.Ed.2d 65 (1996).

 Further, even if *Ake* applied, it would be of no help to Gretzler. *Ake* requires that a defendant seeking the appointment of a psychiatrist make a preliminary showing that his sanity will likely be a significant issue at trial. *Williams v. Calderon,* 52 F.3d 1465, 1473 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 937, 133 L.Ed.2d 863 (1996). As discussed more extensively in Section I.B, *infra,* Gretzler made no such showing; the trial court found, based on the testimony of two psychiatrists, that Gretzler's sanity was not an issue. The court's decision to afford no further psychiatric assistance was therefore not a constitutional violation.

### B. Ariz.Rev.Stat. § 13–4013(B) [3]

Citing Ariz.Rev.Stat. § 13–4013(B), Gretzler contends that he had a protected liberty interest by operation of state law in a right to the assistance of a psychiatric expert, and the State improperly deprived him of that right. Section 13–4013(B) states:

> When a person is charged with a capital offense the court may on its own initiative and shall upon application of the defendant and a showing that the defendant is financially unable to pay for such services, appoint such investigators and expert witnesses as are reasonably necessary adequately to present his defense at trial and at any subsequent proceeding. Compensation for such investigators and expert witnesses shall be such amount as the court in its discretion deems reasonable and shall be paid by the county.

The State concedes the first half of Gretzler's argument by acknowledging that the mandatory language of section 13–4013(B) creates a protected liberty interest and that due process requires its fulfillment. *See Hewitt v. Helms,* 459 U.S. 460, 471–72, 103 S.Ct. 864, 871–72, 74 L.Ed.2d 675 (1983). The State denies that Gretzler was deprived of any due process. The only question before us, then, is "whether the process afforded [Gretzler] satisfied the minimum requirements of the Due Process Clause." *Id.* at 472, 103 S.Ct. at 871. We conclude that it did.

The district court's findings on this point bear quotation at some length:

> In this case, the trial court allowed Gretzler and the State to each choose a psychiatric expert. Gretzler chose Dr. Gurland; the State chose Dr. Beigel. The Court ordered those experts to determine whether Gretzler was competent to stand trial and whether he was sane at the time of the Sandberg killings. The trial court stated that it wanted to make sure Gretzler had adequate psychiatric representation. After hearing the results, the trial [court] found Gretzler competent to stand trial.

---

**3.** At the time of Gretzler's trial and conviction, Ariz.Rev.Stat. § 13–4013(B) appeared on the statute books as § 13–1673(B). The section was renumbered in 1977 but not otherwise changed.

Later, Hoffman [defense counsel] filed a motion asking the trial court to appoint an investigator and to appoint psychiatric experts to determine whether Gretzler, although not insane under M'Naghten, could be considered a lunatic under Arizona law; to determine the effects of amphetamine and cocaine on Gretzler; and to determine Gretzler's ability to form specific intent. The trial court granted the motion for the investigator with the limit of $250 and provided that Hoffman could return to the court once those funds were exhausted to show why additional funds were needed. The trial court took under advisement the request for additional experts.

At a hearing on September 2, 1975, the trial court noted that approximately one week prior, it had met in chambers with Hoffman and the prosecutor and telephoned Dr. Beigel, who stated that it would not have been necessary to have spent more time with Gretzler in order to give an opinion on either Gretzler's mental state at the time of the killings or his competence to stand trial. Dr. Beigel also stated that further examination would not assist him in forming an opinion about the extent of Steelman's control over Gretzler and whether Gretzler's drug usage would have caused him to commit acts which he might not have otherwise committed.

Hoffman had discussed those same questions with Dr. Gurland and had reported to the trial court that Dr. Gurland likewise had stated that additional time would not assist him in forming an opinion on either Gretzler's mental state or competence to stand trial. Consequently, the trial court ruled that because Hoffman had presented no reasonable grounds to indicate that additional testing would assist the psychiatrists to render an opinion, it denied the motion for additional mental examinations. Hoffman then requested funds to travel to California to interview the doctors who had examined Gretzler. The trial court instructed Hoffman to telephone the doctors and to report back to the court with more

information. The trial court reserved further ruling pending Hoffman's conversations with the doctor. Hoffman spoke with one of the California doctors, Dr. Peal who was here in Arizona testifying in Steelman's case. Dr. Peal told Hoffman that he was willing to examine Gretzler. Hoffman apparently never told the trial court about this offer nor sought the funds to obtain Dr. Peal's services.

C.R. # 124, at 17–19 (internal citations omitted).

Citing such cases as *Ake* and *Smith v. McCormick,* 914 F.2d 1153 (9th Cir.1990), Gretzler argues that it was not enough for the trial court to allow the defense and the State each to select a psychiatric expert to examine Gretzler and then report their findings to the court concerning his sanity at the time of the Sandberg killings and his ability to stand trial: "The right to psychiatric assistance does not mean the right to place the report of a 'neutral' psychiatrist before the court; rather it means the right to use the services of a psychiatrist in whatever capacity defense counsel deems appropriate[.]" *Smith,* 914 F.2d at 1157.

■ We reject this line of argument. We have already concluded that *Ake* does not apply, and Gretzler's reliance on *Smith* is misplaced, as that decision is based entirely on *Ake.* Moreover, even "*Ake* makes clear that psychiatric assistance is a contingent, not an absolute, right: it holds that *when a defendant has made a preliminary showing* that his sanity at the time of the offense is likely to be a significant factor at trial the state must provide psychiatric assistance." *Williams v. Calderon,* 52 F.3d 1465, 1473 (9th Cir.1995) (emphasis in original; citation and internal quotation omitted), *cert. denied,* — U.S. —, 116 S.Ct. 937, 133 L.Ed.2d 863 (1996).

■ Here, the trial court did not simply reject Gretzler's request for the assistance of a psychiatric expert. Rather, the court held that, if the results of his Rule 11 examination[4] indicated the likelihood of an insanity

4. Rule 11 of the Arizona Rules of Criminal Procedure concerns claims of incompetency and provides for mental examinations. Rule 11.2 requires a motion to determine a defendant's competency to stand trial or his sanity at the time the crime was committed. If such a motion

defense, Gretzler could seek such additional assistance. Based on the testimony of the two psychiatrists, the court found that Gretzler had been sane at the time he committed the Sandberg killings and that he was competent to stand trial. The trial court's exercise of its discretion in this matter complied with the requirements of Ariz.Rev.Stat. § 13–4013(B) and did not constitute a denial of due process.[5] *Cf. Gretzler*, 612 P.2d at 1053 (requirements of Ariz.Rev.Stat. § 13–1673(B) within court's sound discretion; relying on *Mason v. Arizona*, 504 F.2d 1345, 1352 (9th Cir.1974) (similar provision under federal law), *cert. denied*, 420 U.S. 936, 95 S.Ct. 1145, 43 L.Ed.2d 412 (1975)).

## II. Ineffective Assistance of Counsel

Gretzler next argues that he was denied his right to the effective assistance of counsel by virtue of his lawyer's failure to exercise due diligence in pursuing a psychiatric or drug intoxication defense. Before we can proceed to discuss the merits of this contention, however, we must first determine whether this issue is even properly before us.

### A. Procedural Default

■ The State insists that review of this claim is barred because Gretzler procedurally defaulted when he failed to assert it in his first post-conviction relief petition. The general rule with respect to procedural default is simple and straightforward:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991).

This requirement of "an independent and adequate state procedural rule" is a strict one: "[F]ederal courts on habeas corpus review of state prisoner claims ... will presume that there is no independent and adequate state ground for a state court decision when ... the adequacy and independence of any possible state law ground is not clear from the face of the opinion." *Id.* at 734–35, 111 S.Ct. at 2557.

■ In Gretzler's second PCR, the state trial court did not clearly set forth an independent and adequate state law basis for rejecting the ineffective assistance claim. Moreover, the trial court chose to reach the merits of the claim, and did so by applying federal law. Finally, the preclusive language of the trial court's minute entry order appears to apply only to a single issue, *viz.*, the previously raised *Ake* claim, and not to the ineffective assistance claim, which was not included in the first PCR. Accordingly, we find no error in the district court's determination that Gretzler's ineffective assistance claim was not procedurally barred.

### B. Performance/Prejudice

■ In order to show that his counsel was ineffective, Gretzler must demonstrate both deficient performance and resultant prejudice. *See United States v. Ricardo*, 78 F.3d 1411, 1418 n. 15 (9th Cir.1996). More specifically,

> A defendant claiming ineffective assistance of counsel must demonstrate that (1) counsel's actions were outside the wide range of professionally competent assistance, and (2) that defendant was prejudiced by reason of counsel's actions. *Strickland v. Washington*, 466 U.S. 668, 686–90, 104 S.Ct. 2052, 2064–66, 80 L.Ed.2d 674 (1984). However, to establish such a claim, a petitioner must overcome the "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id.* (citations omitted).

---

is made, Rule 11.3 provides a vehicle for appointing at least two medical experts to conduct such an examination.

5. In light of our holding on this point, we need not and do not reach the merits of Gretzler's argument that the trial court's handling of this matter constituted structural error not subject to harmless error analysis.

*United States v. Baramdyka*, 95 F.3d 840, 844 (9th Cir.1996).

On November 21, 1984, the trial court found that Gretzler's attorney (Hoffman) had failed to exercise due diligence with respect to the testimony of Doctors Peal and Smith concerning Gretzler's mental state. Gretzler argues that this finding not only satisfies the first (deficient performance) prong of *Strickland*, but also indicates a reasonable probability that the results of his trial would have been different if the testimony on drug-induced psychosis or insanity had been introduced, thereby satisfying the second (prejudice) prong. We disagree.

■ Whatever may be said of Hoffman's failure to follow up on Drs. Peal and Smith, this is clearly not a case in which counsel conducted *no* investigations. Moreover, we must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065 (citation and internal quotation omitted).

■ Hoffman's defense theory was that Gretzler's mental condition and drug usage made him a "follower" who would obey whatever commands Steelman gave him. This strategy was based on an overriding concern that the facts of Gretzler's prior bad acts be kept from the jury. The presentation of this theory, however, depended on the state of the law as it then existed.

At the time of Gretzler's trial, evidence of intoxication, whether induced by alcohol or drugs, was admissible to show lack of specific intent to commit the crime charged. *State v. Durgin*, 110 Ariz. 250, 517 P.2d 1246, 1249 (1974). However, it was also the law at the time of Gretzler's trial that an expert could not render an opinion based on facts not in evidence. *State v. Drury*, 110 Ariz. 447, 520 P.2d 495, 504 (1974). Thus, Gretzler might have had to take the witness stand in order for Hoffman to lay the proper foundation necessary to get the psychiatrists' testimony before the jury. Even then, such experts could not have given opinions concerning whether Gretzler had acted with specific intent when he killed the Sandbergs. *See State v. Christensen*, 129 Ariz. 32, 628 P.2d 580, 583–84 (1981). Moreover, any testimony Dr. Peal would have given concerning Gretzler's alleged insanity at the time of the crimes would have been countered by the State submitting the testimony of Drs. Austin, Beigel, Gurland, and Rogerson, all of whom would have said that Gretzler was sane under *M'Naghten*. Finally, all of Gretzler's prior bad acts could have been admissible had he presented a defense of either lack of specific intent due to drug usage or insanity. *See State v. Neal*, 143 Ariz. 93, 692 P.2d 272, 280 (1984).

Under the circumstances, it is difficult to believe that the outcome of Gretzler's trial would have been different if the jury had heard about the brutal deaths of fifteen other people as detailed in Gretzler's confessions. Accordingly, we find no error in the district court's conclusion that Gretzler failed to satisfy both prongs of the *Strickland* test.

### III. Admission of Custodial Statements

■ Gretzler's third argument is that the trial court violated his Fifth, Sixth and Fourteenth Amendment rights when it admitted into evidence certain statements he made that were obtained in violation of the standards set forth in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). While conceding that *Edwards* does not apply retroactively, Gretzler contends that retroactivity is not at issue; *i.e.*, although his judgment of conviction had been affirmed by the Arizona Supreme Court more than a year before *Edwards* was decided, that conviction was not yet final because the Arizona Supreme Court had remanded for resentencing, and his resentencing was not affirmed until January 6, 1983, and the Supreme Court did not deny certiorari until May 31, 1983, some two years after *Edwards*. We reject this position as finding no support in the law.

■ The Supreme Court has said that, "By 'final,' we mean a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the

time for a petition for certiorari elapsed or a petition for certiorari finally denied." *Griffith v. Kentucky,* 479 U.S. 314, 321 n. 6, 107 S.Ct. 708, 712 n. 6, 93 L.Ed.2d 649 (1987) (citing *United States v. Johnson,* 457 U.S. 537, 542 n. 8, 102 S.Ct. 2579, 2583 n. 8, 73 L.Ed.2d 202 (1982) and *Linkletter v. Walker,* 381 U.S. 618, 622 n. 5, 85 S.Ct. 1731, 1734 n. 5, 14 L.Ed.2d 601 (1965)). Where a judgment of conviction has been upheld by a state's highest tribunal and the vacation of a sentence is on grounds wholly unrelated to the conduct of the trial, that conviction is final for purposes of retroactivity analysis. *United States v. Judge,* 944 F.2d 523, 526 (9th Cir.1991), *cert. denied,* 504 U.S. 927, 112 S.Ct. 1988, 118 L.Ed.2d 585 (1992); *United States v. Baron,* 721 F.Supp. 259, 261 (D.Haw.1989). *Accord Richardson v. Gramley,* 998 F.2d 463, 464 (7th Cir.1993), *cert. denied,* 510 U.S. 1119, 114 S.Ct. 1072, 127 L.Ed.2d 390 (1994).

Gretzler's judgment of conviction had been affirmed on direct appeal, and the time in which he could have filed a petition for writ of certiorari to the Supreme Court had elapsed months before *Edwards.* The fact that he chose not to file a petition for writ of certiorari in 1980 is irrelevant. As the State notes, Edwards himself, in the very case upon which Gretzler now relies, obtained relief from the Supreme Court of the United States, even though the Arizona Supreme Court had affirmed his judgment of conviction but remanded for resentencing for the identical reason it remanded Gretzler's case. *See State v. Edwards,* 122 Ariz. 206, 594 P.2d 72, 82 (1979), *cert. granted sub nom. Edwards v. Arizona,* 446 U.S. 950, 100 S.Ct. 2915, 64 L.Ed.2d 807 (1980), *rev'd,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

■ Even if we were to agree with Gretzler that this argument is properly before us, we would nevertheless reject his contention that the trial court's admission of the statements ran afoul of *Edwards.* Gretzler made no unambiguous request for counsel that would have required the officers to cease questioning him. *See Davis v. United States,* 512 U.S. 452, 458–60, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994). Moreover, the record shows that it was Gretzler who insisted on talking with the detectives, despite admonitions from his attorney and warnings from the officers that they could not talk "unofficially" with him. Gretzler was repeatedly read, and he just as often waived, his *Miranda* rights. There was no error.

## IV. Consideration of California Convictions

■ Gretzler's fourth argument is that the trial court erred by considering at sentencing his nine California murder convictions, arguing that the guilty pleas underlying those convictions were invalid due to ineffective assistance of counsel which rendered them unknowing and involuntary. Citing *Custis v. United States,* 511 U.S. 485, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994), the district court held that Gretzler could not mount a collateral attack on his prior convictions because those prior convictions were not void for *Gideon* violations.

■ We believe that the district court has read *Custis* too broadly. That case stands for the proposition that, absent a *Gideon* violation, a defendant in a federal sentencing proceeding has no constitutional right to attack collaterally the validity of previous state convictions used to enhance his federal sentence. 511 U.S. at 496, 114 S.Ct. at 1738–39. The underlying state sentences, however, remain subject to attack in state court "or through federal habeas review." *Id.* at 497, 114 S.Ct. at 1739 (citing *Maleng v. Cook,* 490 U.S. 488, 492, 109 S.Ct. 1923, 1926, 104 L.Ed.2d 540 (1989)). *See also Brock v. Weston,* 31 F.3d 887, 890 (9th Cir. 1994) ("The Court's constitutional holding was, as its citation to *Maleng* evidences, clearly premised on the fact that collateral attacks based on other defects may be heard on habeas review.").

The gist of Gretzler's argument is that his California lawyer was ineffective (more accurately, the California trial judge had misled him) because Gretzler had not been informed about the possible consequences in Arizona of his nine California convictions. At his hearing on resentencing, Gretzler filed a motion *in limine,* seeking to preclude the State from introducing the California convictions as aggravating factors at sentencing. The trial court found that the California judge who

accepted Gretzler's guilty pleas to nine counts of murder had misled Gretzler into thinking that his California convictions would not have any effect on any other proceedings.[6]

After reviewing the California record, the Arizona Supreme Court set aside the trial court's grant of the motion *in limine*, holding as follows:

> The failure of the California judge to accurately inform the defendant of the consequences in Arizona of defendant's plea in California does not, however, render the California judgments void. The law does not require a judge in one state to accurately explain the law of a sister state before a plea of guilty to a crime in the pleading state may be accepted as voluntary. The record shows that in the instant case defendant pled guilty to nine murders pursuant to a plea bargain. There was a factual determination by the California court that he was in fact guilty of those nine murders and that the pleas were voluntarily made. We find no violation of the requirements of *Boykin v. Alabama*, [395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)] supra, in the acceptance of the defendant's pleas of guilty in the California court which would render the judgments void.
>
> * * *
>
> The California judgments were entered in good faith. There was no indication that defendant was purposely misled, or that he pled guilty to crimes that he did not commit. Any violation of the *Boykin* requirements was technical in nature and not made less technical by the fact that the death penalty was involved. The judgments of guilt to the nine murders are the

kind of aggravating circumstances that the legislature intended the courts of this state to consider in deciding whether to impose the death penalty. The judgments are not void, *Burgett v. Texas*, [389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967)] supra, and not subject to collateral attack in Arizona. *United States v. Timmreck*, [441 U.S. 780, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979)] supra; *United States v. Lopez-Beltran*, [619 F.2d 19 (9th Cir.1979)], supra.

*State v. Superior Court*, 128 Ariz. 583, 627 P.2d 1081, 1083–84 (1981).

In light of the above, we conclude that the trial court did not commit error of constitutional magnitude by considering as aggravating factors Gretzler's nine California murder convictions.

### V. Unconstitutional Vagueness

Gretzler's fifth argument is that, at the time of his resentencing, the "heinous, cruel, or depraved" standard of Ariz.Rev.Stat. § 13–703(F)(6) (former section 13–454(E)(6)) was unconstitutionally vague; *i.e.*, it was only in his case that the Arizona Supreme Court properly narrowed the definition of that standard as an aggravating factor at sentencing. Because we reject this contention for the same reasons so ably set forth in the district court's Order and Memorandum of September 26, 1995, we quote that portion of its decision in its entirety:

> *Gretzler II* [i.e., *State v. Gretzler*, 135 Ariz. 42, 659 P.2d 1 (Ariz.1983)] did not announce a new narrowing definition of which Gretzler could not have been aware. This is self evident from the language of

---

6. THE COURT: Now, Mr. Gretzler, and Mr. Dedekam, if it has been explained to you, all right, but if not, I would like to explain to you, that you understand that the pleas you have entered in this proceeding, of course, will not affect any other charge or charges which may be pending in any other jurisdiction? You understand that?
DEFENDANT GRETZLER: Yes.
THE COURT: This only takes care of the matters that are before this court in this county.
DEFENDANT GRETZLER: That means they do not affect either way?

THE COURT: That's right. That's correct. It has nothing to do with any other proceeding which may or has been initiated. Excuse me. I have been advised by counsel there is some proceeding in another state. And there's some proceeding in one or two other counties. Now I am not certain of that. But you understand, of course, whatever action is taken here, and your plea here does not affect those proceedings at all. You understand that?
DEFENDANT GRETZLER: Right. I understand that.
*State v. Superior Court*, 128 Ariz. 583, 627 P.2d 1081, 1082 (1981).

the opinion. In the first paragraph on this topic, the Arizona Supreme Court states:

[w]e have already considered an identical claim in another case and have held this aggravating circumstance was not defined in an unconstitutionally broad or vague manner. *State v. Ortiz*, 131 Ariz. 195, 206, 639 P.2d 1020, 1031 (1981), *cert. denied*, 456 U.S. 984, 102 S.Ct. 2259, 72 L.Ed.2d 863 (1982).

* * *

We believe that the statutory phrase ... *has been* construed in a constitutionally narrow fashion, and *has been* properly applied in individual cases.

*Gretzler II*, 135 Ariz. at 50, 659 P.2d at 9 (emphasis added). The Arizona Supreme Court then proceeded to review prior case law which supported its conclusion.

■ Citing some six prior cases, the Arizona Supreme Court stated, "We have explained on *numerous occasions* that cruelty involves the pain and distress visited upon the victims and that heinous and depraved go to the mental state and attitude of the perpetrator as reflected in his words and actions." *Gretzler II*, 135 Ariz. at 50, 659 P.2d at 9 (emphasis added) (citations omitted). It then recognized that it had previously stated that "cruelty involves not only physical pain, but also 'mental ... distress visited upon the victims.'" *Id.* 135 Ariz. at 51, 659 P.2d at 10 (citing *State v. Clark*, 126 Ariz. 428, 436, 616 P.2d 888, 896 (Ariz.[), *cert. denied*, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612] (1980)). Describing the physical pain Michael Sandberg had to endure, the mental anguish both victims suffered for having been held hostage for hours, and the extreme mental anguish Patricia Sandberg had to endure as she listened to her husband being shot to death, the Arizona Supreme Court found that "[t]he Sandbergs clearly suffered the kind of 'mental and physical distress' we *have held* constitutes cruelty." *Gretzler II*, 135 Ariz. at 53, 659 P.2d at 12 citing *State v. Tison*, 129 Ariz. 526, 543, 633 P.2d 335, 352 (Ariz.1981) (emphasis added) [, *cert. denied*, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982) ]. It

is apparent from its prior decisions and the opinion in *Gretzler II*, that Arizona did not perceive itself as announcing any new narrowing definition. Rather, it applied well-developed case law.

The United States Supreme Court has not held that *Gretzler II* marks the moment at which Arizona's cruel and heinous aggravating circumstance became constitutional. In *Walton v. Arizona*, 497 U.S. [639,] at 654, 656, 110 S.Ct. [3047,] at 3057–58 [1990], the constitutionality of Arizona's cruel, heinous and depraved aggravating circumstance was evaluated. *Walton* held that while the statutory language is unconstitutionally vague, the defect had been cured by the Arizona Supreme Court through the development of narrowing definitions. *Id.*, 497 U.S. [at] 654, 110 S.Ct. at 3057. Nowhere in that opinion did *Walton* identify *Gretzler II* as the sole and ultimate source of the Arizona [Supreme Court]'s narrowing definition.

In *Lewis v. Jeffers*, 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990), the Supreme Court observed that in *Gretzler II* the Arizona Supreme Court "recently delineated factors to be considered in determining whether the offense was committed in a heinous or depraved manner." *Id.*, 497 U.S. at 771, 110 S.Ct. at 3097. When noting that infliction of gratuitous violence was one such factor, however, the Supreme Court cited both to *Gretzler II* and *State v. Ceja*, 115 Ariz. 413, 565 P.2d 1274 (Ariz.), *cert. denied*, 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977). Thus, the Court concludes that *Jeffers* does not support a finding that prior to *Gretzler II* Arizona's cruel, heinous and depraved aggravating circumstance was unconstitutionally vague.

Gretzler also claims that *Richmond v. Lewis*, 506 U.S. 40, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992) demonstrates that the aggravating circumstance was not constitutionally defined until *Gretzler II*. In *Richmond*, as in this case, the application of this aggravating circumstance was redetermined by the Arizona Supreme Court during appellate review. *Gretzler II* was subsequent to Richmond's resentencing but

prior to the United [States] Supreme Court's review. In *Richmond,* the State did not argue the constitutionality of the trial court's application of the aggravating circumstance but rather argued only the constitutionality of the Supreme Court's application. The State has done the same thing here. The State had no need to prove the former when it could so easily prove the latter. This Court will not read into that approach, a concession that prior to *Gretzler II* the aggravating circumstance, as applied by the courts, was unconstitutional.

This Court recognizes that recently the Arizona Supreme Court remarked in a footnote that the cruel, heinous and depraved aggravating factor:

> had not yet been adequately narrowed pursuant to *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), at the time of defendant's second sentencing. This did not occur until *State v. Gretzler,* 135 Ariz. 42, 659 P.2d 1, *cert. denied,* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). *See Jeffers v. Lewis [Lewis v. Jeffers],* 497 U.S. 764, 784, 110 S.Ct. 3092, 3104, 111 L.Ed.2d 606 (1990) (holding that *Gretzler* accomplished such a narrowing).

*State v. Richmond,* 180 Ariz. 573, 576 n. 1, 886 P.2d 1329, 1332 n. 1 (Ariz.1994). The Court considers this language as dicta since the issue before the court was not Gretzler's present claim. Given the significance of such a holding on pending death penalty habeas cases, the Court will not elevate dicta in a footnote to a holding. Moreover, even if Gretzler's case is found to have narrowed the cruel and heinous aggravating circumstance, it would not invalidate his sentence. Gretzler's argument that he had no notice of the criteria is unpersuasive.

First, the Arizona Supreme Court specifically relied on 1980 and 1981 cases in summarizing the criteria to determine if a murder was cruel. These included the infliction of emotional distress on the victims, *State v. Clark, supra,* and being held at gun point for an extended period of time and witnessing the killing of other family members was cruel [sic]. *State v. (Ricky) Tison,* 129 Ariz.526, 633 P.2d 335 (Ariz. 1981). Gretzler had the benefit of these cases available to him at the time his second sentence was appealed. He was not forced to "forecast" a narrowing definition. Second, the Arizona Supreme Court found the aggravating circumstance itself based on the facts: the fact that Michael and Patricia were held prisoner for an extended period; the fact that Patricia Sandberg "had to endure the unimaginable terror of having her husband shot to death within her hearing, and then having to wait for her own turn to come." *Gretzler II,* 135 Arizona at 53, 659 P.2d at 12. Gretzler knew these were the relevant facts based on existing case law. No change in Gretzler's argument could alter the facts.

Gretzler relies on *Moore v. Clark [Clarke],* 904 F.2d 1226, 1230–31 (8th Cir.1990), *cert. denied,* 504 U.S. 930, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992) for the proposition that defendants should not be required to forecast narrowing definitions. In *Moore,* the state attempted to rely on a narrowing definition presented in a case decided six years after Gretzler's sentencing to prove that the aggravating circumstance was constitutional at the time of sentencing. There the Eighth Circuit expressly found that the new case did not merely clarify existing law because the new case could not be reconciled with prior case law. That is not the case here. Nothing stated in *Gretzler II* is claimed to be in conflict with prior cases. In addition, the new law announced in *Moore* did not rectify the constitutional infirmity. Thus, the Court finds *Moore* inapposite.

*Gretzler II* did not announce new law. It merely reviewed existing law to further describe a constitutionally acceptable aggravating circumstance.

C.R. # 124, at 50–54 (brackets added; footnote omitted; minor typographical errors corrected).

## VI. Double-Counting

Gretzler's sixth argument is that the sentencing court and the Arizona Supreme Court subjected him to double jeopardy by

double-counting his California murder convictions; *i.e.,* his California convictions were used as the basis for two separate aggravating factors in prescribing the death penalty. We disagree.

■ The relevant statute, Ariz.Rev.Stat. § 13–703(E)–(G) (former section 13–454(D)–(F)),

> does not require that the number of aggravating circumstances be weighed against the number of mitigating circumstances. One mitigating circumstance, for example, may be "sufficiently substantial" to outweigh two aggravating circumstances. The converse is also true—one aggravating circumstance could be so substantial that two or more mitigating circumstances would not be "sufficiently substantial to call for leniency."

*State v. Brookover,* 124 Ariz. 38, 601 P.2d 1322, 1326 (1979) (quoting former section 13–454(D)). Nevertheless, although one fact (e.g., a single conviction) may be used to establish two aggravating circumstances, that fact may be weighed only once. *State v. Tittle,* 147 Ariz. 339, 710 P.2d 449, 455 (1985).

■ In reviewing the trial court's resentencing of Gretzler, the Arizona Supreme Court considered only those facts associated directly with the convictions. While recognizing that there were two aggravating circumstances based on the nine California murder convictions, the Arizona Supreme Court limited its focus to the fact of the convictions and the nature of the crime on which those convictions were based:

> We feel compelled to comment that the crime on which defendant's previous convictions are based, the cold blooded mass murder of nine persons, including the shooting of sleeping children as they lay in their beds, is more than sufficiently offensive to place the defendant well above the norm of first degree murderers.

*State v. Gretzler,* 659 P.2d at 17. As the district court noted, "Nowhere did the court indicate that it was influenced by the fact that such a crime was an aggravating circumstance both because it was punishable by life imprisonment or death, *and* because it involved the threat or use of violence." C.R.

# 124, at 56 (internal citations omitted). Accordingly, we find no merit to this contention.

## VII. Proof of Aggravating Factors Beyond a Reasonable Doubt

Gretzler's seventh argument is that the trial court did not understand, and therefore did not properly apply, the correct standard when it failed to require proof beyond a reasonable doubt for the existence of aggravating circumstances that warranted imposition of the death penalty. We reject this contention.

■ The Supreme Court has declared that "[t]rial judges are presumed to know the law and to apply it in making their decisions." *Walton v. Arizona,* 497 U.S. 639, 653, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990). In 1980, well before the trial court resentenced Gretzler, the Arizona Supreme Court expressly held that the standard to be applied in such situations was that of beyond a reasonable doubt. *State v. Jordan,* 126 Ariz. 283, 614 P.2d 825, 828, *cert. denied,* 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980). While the trial judge expressed some concern that the law governing two of the aggravating circumstances appeared difficult to reconcile, we agree with the district court that this evidence is insufficient to overcome the presumption that the court knew and applied the correct law. The fact that the trial judge did not clearly and unambiguously make such an express finding on the record is not determinative. *See Clark v. Ricketts,* 958 F.2d 851, 859–60 (9th Cir.) (as amended), *cert. denied sub nom. Clark v. Lewis,* 506 U.S. 838, 113 S.Ct. 117, 121 L.Ed.2d 73 (1992).

## VIII. Consideration of Non–Statutory Aggravating Factor

■ Gretzler's eighth argument is that the Arizona Supreme Court improperly relied on a non-statutory aggravating factor, *i.e.,* the high court considered the facts underlying his nine California murder convictions. Gretzler concedes that he failed to present this issue to the state courts, and he did not raise the issue before the district court by including it in either his original or

amended petition for writ of habeas corpus.[7] Accordingly, we decline to reach the merits of this argument.

### IX. Review of Statement of Victim's Father

Gretzler's ninth argument is that the trial court improperly considered a statement from the victim's family, *viz.*, a letter from Patricia Sandberg's father asking that Gretzler be sentenced to death. This contention fails.

■■■■■ Evidence about a victim's characteristics and the impact of the murder on the victim's family is relevant and admissible at a death penalty sentencing proceeding. *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991). Admission of such evidence will only be deemed unconstitutional if it is so unduly prejudicial that it renders the sentence fundamentally unfair. *Id.* at 825, 111 S.Ct. at 2608. As the district court properly noted, the comments of Patricia's father were admissible not for their truth, but as a reflection of the anguish her death caused to her family. Moreover, the letter was not submitted in its entirety to a sentencing jury, but was reviewed by the judge. Accordingly, and in the absence of any evidence to the contrary, we must assume that the trial judge properly applied the law and considered only the evidence he knew to be admissible. *See Walton*, 497 U.S. at 653, 110 S.Ct. at 3057.

### X. Communication with Prosecutor

■■■ Gretzler's final argument is that his constitutional rights were violated when the trial judge had a conversation with Steve Neely, one of the attorneys in the prosecutor's office, concerning the local publicity surrounding Gretzler's prosecution. Neely was not the attorney who prosecuted Gretzler; there was no evidence showing that anything improper occurred; and, following an extensive hearing on Gretzler's motion demanding that the trial judge recuse himself, the judge

assigned to the matter found no grounds for recusal. The state court's finding that the trial judge was impartial is not only supported by the record, but is a finding of historical fact that is entitled to a presumption of correctness. *Cf. Greenawalt v. Ricketts*, 943 F.2d 1020, 1029 (9th Cir.1991) (finding that jury was impartial is historical fact entitled to presumption of correctness · on collateral review; citing *Patton v. Yount*, 467 U.S. 1025, 1036–40, 104 S.Ct. 2885, 2891–94, 81 L.Ed.2d 847 (1984)), *cert. denied sub nom. Greenawalt v. Lewis*, 506 U.S. 888, 113 S.Ct. 252, 121 L.Ed.2d 184 (1992).

### CONCLUSION

Because we find no merit to any of Gretzler's arguments, the district court's decision to grant summary judgment in favor of the respondent is

AFFIRMED.

PREGERSON, Circuit Judge, dissenting:

Douglas Edward Gretzler has been sentenced to death following a trial that lacked fundamental fairness. In denying Gretzler's habeas petition, United States District Judge Richard M. Bilby observed:

> This case represents everything that is wrong with death penalty litigation-an inexperienced lawyer (only three years experience with no death penalty cases); a parsimonious criminal system that would not grant the defendant sufficient funds to adequately defend himself; and an overzealous prosecutor who did his best, successfully, to deprive the defendant of needed funds for an adequate defense.

*Gretzler v. Lewis*, No. 85–537 TUC RMB, slip op. at 67 n. 9 (D.Ariz. Sep. 26, 1995).

The crucial issue at Gretzler's trial was whether Gretzler could form the specific intent necessary to sustain a conviction for first-degree murder. Gretzler's counsel repeatedly requested that the trial court appoint an independent psychiatrist to assist in

---

7. Gretzler's contention that he had no opportunity to present the issue in a timely manner is meritless. He made no effort to present the issue to the Arizona Supreme Court in, *e.g.*, a petition for rehearing, and his passing reference to the issue in his cross-motion for summary judgment hardly justifies his failure to present the issue in either his original or amended petitions for writ of habeas corpus.

the preparation and presentation of an adequate defense on this issue. The court denied these requests. The trial court's failure to provide Gretzler with the assistance of an independent psychiatrist violated Gretzler's due process rights. Therefore, I would reverse Gretzler's conviction and grant him a new trial.

## I.

Evidence discovered *after* Gretzler's conviction supports his claim that he lacked the necessary intent to commit first-degree murder. The evidence includes the following:

(1) at age 13, Gretzler was diagnosed as suffering from anxiety and depression;

(2) from age 13 until the time the murders were committed, Gretzler used amphetamines and LSD as a means of self-medication;

(3) when Gretzler was 16, his older brother killed himself;

(4) Gretzler suffered from a significant mental disorder—"schizophrenic reaction, paranoid type"—throughout most of his life;

(5) at the time of the offenses, Gretzler was taking intravenous doses of amphetamines, had gone without sleep for several days, and likely suffered from amphetamine-induced psychosis;

(6) amphetamine-induced psychosis can impair the ability to premeditate and lead to paranoia and hyper-suggestibility—a condition which causes a person to follow commands or suggestions without any thought as to whether the action is right, wrong, or even possible;

(7) the amphetamine-induced psychosis may have permitted Gretzler's companion, Willie Steelman, to control Gretzler's actions;

(8) a person in an amphetamine-induced psychosis would generally meet the M'Naghten insanity test;

(9) amphetamine-induced psychosis is associated with a high incidence of uncontrollable violence; and

(10) at the time of the offenses, Gretzler did not know the nature and quality of his acts or that what he did was wrong.

Gretzler claims that the trial court's refusal to appoint an independent psychiatrist to assist in the defense prevented his attorney, David Hoffman, from placing before the jury critical evidence on Gretzler's mental state.

Defense counsel Hoffman made his first request for the assistance of an independent psychiatrist under Arizona Revised Statutes § 13–1673(B) (now Ariz.Rev.Stat. § 13–4013(b)) which provides:

> When a person is charged with a capital offense the court may on its own initiative and *shall* upon the application of the defendant and a showing that the defendant is financially unable to pay for such services, *appoint* such investigators and *expert witnesses as are reasonably necessary adequately to present his defense* at trial and at any subsequent proceeding.

*Id.* (emphases added). This section expressly mandates the appointment of expert witnesses needed by indigent capital defendants like Gretzler. Nevertheless, the trial court denied Hoffman's request.

At the court's direction, Hoffman then filed a motion for a psychiatric examination of Gretzler under Rule 11 of the Arizona Rules of Criminal Procedure. Under Rule 11, the trial court may appoint one expert nominated by the accused and one expert nominated by the state. Ariz.R.Crim.P. 11.3. Rule 11 further provides that "[t]he court may, in its discretion, appoint additional experts ... when advised by an appointed expert that such examinations are necessary to an adequate determination of the defendant's mental condition." *Id.* 11.3(f). Hoffman nominated Dr. David Gurland on Gretzler's behalf; the state nominated Dr. Allan Beigel. The doctors were to determine whether Gretzler was competent to stand trial and examine his mental state at the time of the murders. *Id.* 11.2. The doctors reported their results directly to the trial court. Rule 11 did not require either doctor to assist Hoffman in the evaluation, preparation, or presentation of Gretzler's defense.

Dr. Gurland spent approximately two hours preparing for the exam and about one hour with Gretzler. Dr. Beigel examined Gretzler for about forty-five minutes. Both doctors found Gretzler competent to stand

trial. Both doctors also found that at the time of the murders, Gretzler was impaired by his drug use but could form intent. Although Dr. Gurland did explore Gretzler's drug use, he did not know the quantity of drugs involved. Dr. Beigel concluded that at the time of the murders, Gretzler was probably in "an acute paranoid state and possibly paranoid schizophrenic." Based on these reports, the trial court found Gretzler competent to stand trial.

Hoffman then made a second request for the assistance of an independent psychiatrist under Ariz.Rev.Stat. § 13–1673(B). Hoffman based the request on the insufficiency of the Rule 11 examinations and on the state's disclosure that Gretzler had engaged in heavy drug use at the time of the murders. Hoffman stated:

[D]efendant is in dire need of the appointment of a psychiatrist . . . to determine the effect of amphetamine-based drugs and cocaine taken in combination upon the defendant; to determine the defendant's ability to form specific intent; and to do a complete psychiatric and psychological examination of the defendant in order to assist counsel in the preparation and presentation of his defense.

Four months later, before the trial court had ruled on Hoffman's second request for the assistance of an independent psychiatrist, Hoffman submitted a new request for extensive psychological testing of Gretzler. This request specifically noted Gretzler's previous institutionalization for mental illness and Dr. Beigel's conclusion that Gretzler was probably in "an acute paranoid state and possibly paranoid schizophrenic" at the time of the murders. The trial court denied Hoffman's request because both Dr. Gurland and Dr. Beigel had indicated that an additional examination was unnecessary.

Finally, near the end of Gretzler's trial, Hoffman, for the fourth time, again sought additional psychiatric examinations based on the insufficiency of the Rule 11 exams and Dr. Beigel's failure to question Gretzler about drug intoxication, an issue which had become central to the case. The trial court again denied Hoffman's request.

## II.

In *Ake v. Oklahoma*, the Supreme Court decreed that indigent individuals have a right to the assistance of a psychiatrist in their defense. The Supreme Court held:

[W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985).

In interpreting *Ake*, this court has noted: "*Ake* makes clear that psychiatric assistance is a contingent, not an absolute, right: it holds that '*when a defendant has made a preliminary showing* that his sanity at the time of the offense is likely to be a significant factor at trial' the state must provide psychiatric assistance." *Williams v. Calderon*, 52 F.3d 1465, 1473 (9th Cir.1995) (quoting *Ake*, 470 U.S. at 74, 105 S.Ct. at 1091–92), *cert. denied*, —— U.S. ——, 116 S.Ct. 937, 133 L.Ed.2d 863 (1996).

In the present case, the majority concludes that Hoffman failed to make the preliminary showing required under *Ake* because the trial court found Gretzler to be sane at the time of the murders and competent to stand trial. The trial court based its decision on the testimony and reports of Dr. Gurland and Dr. Beigel. I disagree with the majority's conclusion.

In cases decided *after Ake*, it is clear that the accused must make a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial. In cases decided *before Ake*, such as the present case, the inquiry is whether counsel *could have* made the preliminary showing. *See Castro v. Oklahoma*, 71 F.3d 1502, 1513 (10th Cir.1995) (noting that in pre-*Ake* cases, the inquiry is whether petitioner *could have* made a preliminary showing) (citing *Liles v. Saffle*, 945 F.2d 333, 336 (10th Cir.1991), *cert. denied*, 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 123 (1992)). Thus, Gretzler only has to show that defense counsel Hoffman *could*

*have* made a preliminary showing that Gretzler's mental state would be a significant factor at trial. Nevertheless, even if Hoffman were required to make a preliminary showing, he satisfied that burden.

Hoffman challenged the trial court's reliance on Dr. Gurland and Dr. Beigel's testimony and reports. Hoffman pointed out the inadequacy of the Rule 11 exam and explained that the effect of Gretzler's mental state and drug usage on his ability to form specific intent could not be addressed without the assistance of an independent psychiatrist. *See Starr v. Lockhart,* 23 F.3d 1280, 1289 (8th Cir.) (finding court-appointed mental health examiners' report inadequate because it did not explain how mild retardation affected the accused's appreciation of the results of actions he admittedly knew were wrong), *cert. denied,* 513 U.S. 995, 115 S.Ct. 499, 130 L.Ed.2d 409 (1994).

Furthermore, Hoffman presented the trial court with sufficient evidence to demonstrate that Gretzler's mental state at the time of the murders would be "a significant factor at trial." *Ake,* 470 U.S. at 74, 105 S.Ct. at 1091. First, Hoffman made repeated requests that the court appoint an independent psychiatrist to assist Gretzler in his defense, including one request during the trial after Gretzler's drug intoxication had been raised as an issue. *Compare Cowley v. Stricklin,* 929 F.2d 640, 643 (11th Cir.1991) (finding that "repeated, timely, and specific requests for expert assistance" satisfied the preliminary showing required under *Ake) with Williams,* 52 F.3d at 1474 (finding no preliminary showing where counsel never moved for appointment of independent psychiatrist nor attempted to demonstrate that mental state would be at issue). Second, Hoffman offered Dr. Beigel's report that concluded that Gretzler was probably in an "acute paranoid state and possibly paranoid schizophrenic" at the time of the murders. Third, the evidence revealed that Gretzler engaged in heavy drug use at the time of the murders. Taken as a whole, this evidence clearly satisfies the preliminary showing under *Ake* that the assistance of an independent psychiatrist was needed because Gretzler's mental state would be a "significant factor at trial."

The Rule 11 exam by Dr. Gurland and Dr. Beigel did not, however, satisfy Gretzler's right to the assistance of an independent psychiatrist under *Ake.* Both the Supreme Court and this court have made it clear that the requirement of psychiatric assistance is not satisfied by the appointment of a neutral psychiatrist answerable to the court. *Ake,* 470 U.S. at 83, 105 S.Ct. at 1096; *Williams,* 52 F.3d at 1473. As this court reasoned in *Smith v. McCormick,* "to grant court-appointed psychiatric assistance only on condition of automatic full disclosure to the fact finder impermissibly compromises presentation of an effective defense, by depriving [the defendant] of 'an adequate opportunity to present [his] claims fairly within the adversary system.'" 914 F.2d 1153, 1159 (9th Cir.1990) (quoting *Ake,* 470 U.S. at 77, 105 S.Ct. at 1093). "Instead, due process requires the appointment of one psychiatrist *for use by the defense in whatever fashion defense counsel sees fit." Williams,* 52 F.3d at 1473 (emphasis added).

In this case, the Rule 11 examinations were not confidential. Dr. Gurland and Dr. Beigel reported their findings directly to the trial court. Furthermore, Rule 11 did not specifically require either psychiatrist to assist Hoffman in the evaluation, preparation, or presentation of Gretzler's defense.[1] Accordingly, Gretzler never received an independent psychiatrist "for use by the defense in whatever fashion defense counsel sees fit."

Hoffman presented the trial court with sufficient evidence to demonstrate that Gretzler's mental state would be a significant issue at trial. Gretzler thus had the right to an independent psychiatrist to assist in evaluating, preparing, and presenting his defense. By denying Gretzler such assistance,

---

1. The Rule 11 exam was also inadequate because Dr. Beigel examined Gretzler only to determine his competency to stand trial, not to determine his mental state at the time of the murders. *See Ford v. Gaither,* 953 F.2d 1296, 1299 (11th Cir. 1992) (finding an *Ake* violation where psychiatrists evaluated defendant but failed to assess defendant's competency at the time of the offense); *Cowley v. Stricklin,* 929 F.2d 640, 645 (11th Cir.1991) (noting that *Ake* is not satisfied by a psychiatrist who failed to determine defendant's mental state at the time of the offense).

the trial court violated Gretzler's due process rights and deprived him of a fundamentally fair trial.

## III.

The question remains how to treat the trial court's error in denying Gretzler the assistance of an independent psychiatrist. I believe that the trial court's error is structural and requires reversal.

Structural error occurs when the "entire conduct of the trial from beginning to end is obviously affected." *Arizona v. Fulminante,* 499 U.S. 279, 309–10, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991). As the Supreme Court stated in *Chapman v. California,* "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." 386 U.S. 18, 23, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967); *see, e.g., Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (right to correct jury instruction on reasonable doubt); *Vasquez v. Hillery,* 474 U.S. 254, 266, 106 S.Ct. 617, 624–25, 88 L.Ed.2d 598 (1986) (right to a racially nondiscriminatory grand jury selection); *Waller v. Georgia,* 467 U.S. 39, 49 n. 9, 104 S.Ct. 2210, 2217 n. 9, 81 L.Ed.2d 31 (1984) (right to public trial); *McKaskle v. Wiggins,* 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 950 n. 8, 79 L.Ed.2d 122 (1984) (right to self-representation); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (right to counsel); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (right to an impartial judge).

Some circuits subject an *Ake* violation to a harmless error analysis. *See, e.g., Tuggle v. Netherland,* 79 F.3d 1386, 1392–93 (4th Cir.), *cert. denied,* — U.S. —, 117 S.Ct. 237, 136 L.Ed.2d 166 (1996); *Brewer v. Reynolds,* 51 F.3d 1519, 1529 (10th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 936, 133 L.Ed.2d 862 (1996); *Starr v. Lockhart,* 23 F.3d 1280, 1291–92. (8th Cir.), *cert. denied,* 513 U.S. 995, 115 S.Ct. 499, 130 L.Ed.2d 409 (1994). *Ake* itself, however, simply reversed the conviction without discussing harmless error analysis. *See also Smith v. McCormick,* 914 F.2d at 1170 (reversing conviction without engaging in harmless error analysis);

*Ford v. Gaither,* 953 F.2d 1296 (11th Cir. 1992) (same); *Cowley v. Stricklin,* 929 F.2d 640 (11th Cir.1991) (same).

In *Vickers v. Arizona,* Justice Marshall, *Ake*'s author, stated that:

> [The Arizona Supreme Court] wrongly subjects *Ake* claims to harmless-error analysis. In *Ake,* we did not endeavor to determine whether the petitioner's case had been prejudiced by the lack of a psychiatrist. Rather, we determined that, in general, psychiatric assistance is of extreme importance in cases involving an insanity defense, and that without that assistance "the risk of an inaccurate resolution of sanity issues is extremely high." Because the petitioner had made the threshold showing that his sanity was a significant issue at trial and the State had failed to offer psychiatric assistance, we reversed and remanded for a new trial.

497 U.S. 1033, 1037, 110 S.Ct. 3298, 3300, 111 L.Ed.2d 806 (1990) (Marshall, J., dissenting from denial of certiorari) (citations omitted). *See also Starr,* 23 F.3d at 1294–95 (McMillian, J., concurring) (stating that *Ake* errors require per se reversal).

*Ake* is based on a determination that to deny psychiatric assistance when the accused's mental state at the time of the offense is at issue creates an extremely high probability of an erroneous factual determination on that issue. *Ake,* 470 U.S. at 82, 105 S.Ct. at 1095–96. Therefore, "competent psychiatric assistance in preparing the defense is a 'basic tool' that must be provided to the defense." *Smith,* 914 F.2d at 1159 (quoting *Ake,* 470 U.S. at 77, 105 S.Ct. at 1093).

In this case, the trial court's failure to appoint an independent psychiatrist to assist in Gretzler's defense affected the entire trial from beginning to end. The only real issue at trial was whether Gretzler had the necessary mental state when the murders were committed. The defense therefore needed an independent psychiatrist to examine Gretzler, draw conclusions about his mental state, help develop effective questions for cross-examination of state witnesses, and explain medical terms. Furthermore, an indepen-

dent psychiatrist could have supplied critical testimony to persuade a jury that Gretzler lacked the requisite intent.

The evidence discovered after Gretzler's conviction casts serious doubt on Gretzler's ability to form the intent required to sustain a conviction for first-degree murder. Without the assistance of an independent psychiatrist, however, Gretzler was precluded from effectively raising his mental state as a defense,[2] and denied the opportunity to present any effective defense.

For all these reasons, the trial court's failure to appoint an independent psychiatrist to assist in Gretzler's defense constitutes structural error which requires automatic reversal.

## IV.

In *Harris v. Vasquez,* this court determined that *Ake* announced a new constitutional rule of criminal procedure. 949 F.2d 1497, 1518 (9th Cir.1990), *cert. denied,* 503 U.S. 910, 112 S.Ct. 1275, 117 L.Ed.2d 501 (1992). "Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Teague v. Lane,* 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989). One *Teague* exception states that "a new rule should be applied retroactively if it requires the observance of those procedures that . . . are implicit in the concept of ordered liberty." *Id.* at 307, 109 S.Ct. at 1073 (internal quotations omitted); *see also Saffle v. Parks,* 494 U.S. 484, 495, 110 S.Ct. 1257, 1263–64, 108 L.Ed.2d 415 (1990) (noting that *Teague* allows retroactivity for " 'watershed rules of criminal procedure' implicating the *fundamental fairness and accuracy* of the criminal proceeding") (quoting *Teague,* 489 U.S. at 311, 109 S.Ct. at 1075–76) (emphasis added).

Because Gretzler's conviction became final prior to the *Ake* decision, *Ake*'s rule cannot

be applied retroactively to this case *unless* an exception applies. Whether *Ake* applies retroactively is still an open question in this circuit. *See Harris,* 949 F.2d at 1519 (stating that "we . . . do not decide *Ake*'s retroactivity"). *But see Bassette v. Thompson,* 915 F.2d 932, 938–39 (4th Cir.1990) (holding that *Ake*'s rule does not apply retroactively).

The majority summarily concludes that it is not convinced that *Ake*'s rule "is a 'watershed rule of criminal procedure' lying in that 'small core of rules' that are 'implicit in the concept of ordered liberty.' " I disagree. *Ake*'s rule applies retroactively because it implicates the fundamental fairness and accuracy of Gretzler's trial.

In *Ake,* the Supreme Court stated:

This Court has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. This elementary principle, grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness, derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake.

*Ake,* 470 U.S. at 76, 105 S.Ct. at 1092.

Whether a new constitutional rule of criminal procedure is a "watershed rule" requiring retroactive application turns on society's interests in conducting a fair proceeding. As the Supreme Court noted in *Ake,* "a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." *Ake,* 470 U.S. at 77, 105 S.Ct. at 1093. Where an indigent's defense in a capital case rests on his mental state at the time of the offense, the assistance of an

---

**2.** "Denial of the assistance of a psychiatrist does more than hinder the defendant in raising an effective insanity defense; it prevents [the accused] from raising the defense at all." Note, Michael J. Lorenger, *Ake v. Oklahoma and Harmless Error: The Case for a Per Se Rule of Reversal,*

81 Va.L.Rev. 521, 547 (1995) (arguing that *Ake* violations should be subject to automatic reversal because the indeterminate effect that psychiatric testimony has on a lay jury makes quantifying the error mere guesswork).

independent psychiatrist is "integral to the building of an effective defense." *Id.*

*Ake*'s rule is also critical to ensure accurate verdicts. "[W]ithout the assistance of a psychiatrist to conduct a professional examination on issues relevant to the defense, to help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examination of a State's psychiatric witnesses, *the risk of an inaccurate resolution of sanity issues is extremely high.*" *Id.* at 82, 105 S.Ct. at 1096 (emphasis added). In *Harris,* this court echoed *Ake*'s concern for accuracy in stating: "[W]e recognize that a defendant's access to a competent psychiatrist might *increase the likelihood of an accurate conviction.*" *Harris,* 949 F.2d at 1520 (emphasis added). *See also id.* at 1529 ("If [a new] rule enhances the accuracy of the determination of the facts *and* goes to fundamental fairness, the rule is applied retroactively. The *Ake* rule is of this kind.") (Noonan, J. concurring in part, dissenting in part).

In this case, the only real issue at trial was Gretzler's mental state at the time of the murders. The appointment of an independent psychiatrist to assist in Gretzler's defense clearly would have increased the likelihood of a fair and accurate verdict. Because the *Ake* rule implicates fundamental fairness and will increase the likelihood of an "accurate conviction," *Ake* should apply retroactively.

For the above-stated reasons, I would reverse the conviction and remand for a new trial.