**Anthony Lee CHANEY, Petitioner–Appellant,**

v.

**Terry STEWART,\* Director, Arizona Department of Corrections, Respondent–Appellee.**

No. 96–99001.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 14, 1998.

Decided Sept. 11, 1998.

\* Terry Stewart, Director, Arizona Department of Corrections, is automatically substituted for his predecessor, Samuel A. Lewis, pursuant to Fed. R.App. P. 43(c).

Thomas J. Phalen (argued) and Michael Terribile (argued), Phoenix, AZ, for petitioner–appellant.

Paul J. McMurdie (argued) and Diane M. Ramsey, Office of Atty. Gen., Phoenix, AZ, for respondent–appellee.

Before: REINHARDT, RYMER and HAWKINS, Circuit Judges.

Opinion by Judge HAWKINS; Partial Concurrence and Partial Dissent by Judge REINHARDT.

MICHAEL DALY HAWKINS, Circuit Judge:

Arizona state prisoner Anthony Lee Chaney ("Chaney") appeals the denial of his habeas corpus petition seeking review of his 1983 conviction and death sentence. Chaney's petition raises some twenty claims, the bulk of which we affirm for the reasons set forth in the order and memorandum of the district court.[1] We focus on the constitutional parameters of a state's duty to provide psychiatric testing and expert assistance when a criminal defendant raises mental defect as a defense or mitigating factor.

*Facts*

Chaney and a companion, Deanna Jo Saunders–Coleman ("Coleman"), having stolen a truck in New Mexico and several guns in Texas, were hiding out in a wooded area outside Flagstaff, Arizona. Their vehicle was approached by Deputy Coconino County Sheriff Robert Cline ("Deputy Cline"). As he walked up to the pair, Deputy Cline radioed in his location and the license number of the Chaney vehicle. When Deputy Cline asked Chaney for identification, Chaney produced an handgun from inside the cab of the pickup and pointed it in Deputy Cline's face. Chaney had Coleman remove the deputy's service revolver and then ordered him to the ground. As Deputy Cline begged for his life, Chaney lashed him to a nearby tree with the deputy's own handcuffs, telling him in sub-

---

1. Chaney raised the following errors in his petition: (1) improper restriction on scope of voir dire concerning jurors' views on the insanity defense and neurological illnesses; (2) violation of right to remain silent; (3) undue restriction on scope of cross-examination of particular witness; (4) state failure to collect and preserve exculpatory evidence; (5) improper admission of tape recordings into evidence; (6) unconstitutional restriction on types of juror misconduct on which to base a motion for new trial; (7) trial court's refusal to consider non-statutory mitigating evidence; (8) trial court's improper consideration of presentence report at sentencing; (9) improper failure to consider and weigh mitigating evidence; (10) improper restriction on admissible mitigating evidence; (11) erroneous conclusion that Chaney's mental state was not mitigating factor; (12) improper election to sentence Chaney for first-degree premeditated murder; (13) ineffective assistance of counsel; (14) denial of assistance of counsel; (15) trial court's concealment that state agent had breached attorney-client confidentiality; (16) trial court's ex parte communication with material witness; and (17) judicial misconduct when trial judge failed to recuse himself.

stance: "I don't need a murder-one rap on top of all my other trouble."

Deputy Cline's radio call produced information that the vehicle was stolen. When the dispatcher tried to reach Deputy Cline over the radio, Chaney heard it and told Coleman to turn it off. When she was unable to do so, the pair jumped in the stolen truck and sped off. In the meantime, John Jamison ("Deputy Jamison"), a local physician who volunteered his time as a Reserve Deputy and who was on duty as Deputy Cline's backup that day, heard the radio traffic and headed for the scene.

As Chaney and Coleman drove away from the scene, they saw Jamison's vehicle approaching. Jamison reported over his radio that he had the stolen truck in sight. Chaney stopped the truck and, as Deputy Jamison pulled up behind, grabbed an AR–15 assault rifle he was carrying and jumped out of the truck. He began repeatedly firing the rifle as he approached the patrol car. Deputy Jamison's last words over his radio were: "Goddamn, someone help, please."

Shell casings found at the scene showed that Chaney fired at least thirty rounds, at least eighteen of which struck Jamison's patrol vehicle. Expert medical testimony showed that Deputy Jamison suffered three gunshot wounds inflicted from behind. Powder burns and metal fragments in Deputy Jamison's clothing showed these last rounds were fired at point-blank range. As he climbed back in the truck, Chaney told Coleman: "Oh God, murder one." The pair sped off, Coleman reloading the AR–15 and Chaney saying: "I just don't want to go back to jail."

Deputy Jamison, his left arm nearly detached, somehow managed to drive a short distance. Fellow deputies reached him just as he was dying. As a trained physician, Deputy Jamison knew his condition and told his mates he knew he was dying. Deputy Jamison survived for about forty minutes and died while being put in an emergency vehicle.

After commandeering another truck from a pair of teenage boys at gunpoint, Chaney and Coleman were arrested without incident at a Flagstaff area gas station. Coleman, who eventually cooperated with authorities and testified against Chaney at trial, is serving a twenty-one year prison sentence for her involvement in these events.

*State Proceedings*

Chaney went to trial in early 1983 on charges of first-degree murder, kidnapping, aggravated assault, armed robbery, burglary, and theft. Because Chaney gave notice of a defense of lack of mental capacity, he was examined by Drs. Gerstenberger and Nolte, two court-appointed psychiatric experts who found him competent to stand trial. Chaney's court-appointed trial counsel agreed, after reading the Gerstenberger and Nolte reports, that Chaney was legally sane at the time of the offense.

Approximately three weeks before trial, Chaney's trial counsel saw a television report concerning new research on a "rare and little-understood" condition, temporal lobe dysfunction/epilepsy. Sensing this might have some application to Chaney's case, counsel contacted Dr. Frank Ervin, a professor of psychiatry affiliated with the Center for Behavioral Neurology in Boston. Chaney's counsel then moved for the appointment of Dr. Ervin as a defense expert and for authorization to perform three additional tests on Chaney: an electroencephalogram ("EEG"), a CT scan, and a pneumoencephalogram ("PEG"). At the same time, Chaney's counsel sent a letter to Dr. Gerstenberger, seeking his opinion whether the additional tests were necessary. Dr. Gerstenberger re-examined Chaney, considered additional information supplied by his counsel, and ultimately concluded there was no substantiation that Chaney suffered from the temporal lobe condition.

Following a hearing at which Drs. Gerstenberger and Nolte were questioned at length and opined that there was very little likelihood that Chaney suffered from the temporal lobe condition, the state trial court denied the request for additional testing and appointment of Dr. Ervin as a defense expert. When trial commenced some eight days after this hearing, Chaney's trial counsel announced that he had brought in Dr. Ervin and a second expert, Dr. Leo Alexander, at his own expense. Drs. Ervin and Alexander

were permitted to examine Chaney, to review all available medical records, medical and expert reports, and test results, and to testify at Chaney's trial.

Prior to trial, two of the three requested additional tests—the CT scan and the EEG—were performed on Chaney at the Barrow Neurological Center under the supervision of Drs. Goldensohn and White, two experts hired by the State as possible rebuttal witnesses. Records of these tests, as well as the Goldensohn–White reports, were among the materials considered by Drs. Ervin and Alexander in their evaluations of Chaney.

At trial, the defense called Drs. Ervin and Alexander and the two court-appointed competency experts, Drs. Nolte and Gerstenberger. Both court-appointed experts testified that there was no evidence of organic brain disease, including temporal lobe disorder, and that further testing of Chaney was not likely to be productive. Coleman, who had lived with Chaney for some time, was asked about observable behavior traits normally associated with temporal lobe disorder. She testified she had observed none of them. Coleman also testified that she believed Chaney knew exactly what he was doing at the time of the killing—a fact Dr. Goldensohn found particularly important. Dr. Goldensohn, a nationally-known psychiatrist, opined it was "inconceivable" that Chaney was suffering from temporal lobe disorder at the time of the shooting of Deputy Jamison. Dr. White testified to the same effect. Dr. Ervin testified he was "65% certain" that Chaney did have the neurological disorder but could not be certain without further testing. Dr. Ervin conceded on cross-examination that these tests were "clumsy" diagnostic tools at best. Dr. Alexander testified, without qualification, that Chaney suffered from temporal lobe disorder at the time of the shooting.

The trial jury found Chaney guilty, and a sentencing proceeding was scheduled. Chaney's trial counsel renewed the request that the court appoint Dr. Ervin as a defense

expert, this time to assist in the sentencing phase. The state trial court refused the request but agreed to consider the trial testimony of both Drs. Ervin and Alexander as a potentially mitigating factor. The trial court ultimately concluded that Chaney did not qualify for application of the mitigating factor mental defect not constituting a defense to the crime.[2] Chaney was thereafter sentenced to death.

*Was Chaney deprived of his constitutional rights in the denial of request for expert psychiatric-neurological assistance at trial?*

■■■ We conclude that any error resulting from the state trial court's denial of Chaney's request for the appointment of a psychiatric or neurological expert at trial is subject to harmless error analysis and, under that standard, any constitutional error did not have a "substantial and injurious effect or influence in determining the jury's verdict" in the guilt phase of Chaney's trial. *See Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). The experts Chaney sought to have appointed actually testified at trial. Further, both Drs. Ervin and Alexander were given access to a battery of test results (including at least two tests the defense had earlier requested) bearing upon Chaney's mental and physical condition. The jury heard from a total of five experts, including two neurologists and three psychiatrists. They also heard from Chaney's girlfriend as to his appearance and demeanor at the time of the murder of Deputy Jamison. Given this extensive testing, and Dr. Ervin's admission that the only tests that were not conducted were clumsy, we cannot say that Chaney was prejudiced without them.

*Did Chaney suffer a due process violation when denied expert psychiatric-neurological assistance at sentencing?*

■■■ A more troubling question is presented by the state trial court's refusal to appoint a defense-requested expert for the sentencing phase of Chaney's trial. The initial re-

---

2. Arizona's death penalty statute contains a nonexhaustive list of potential mitigating factors, including: "The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." Ariz.Rev. Stat. 13–703(G)(1).

quest was very close in time to the start of trial, and the state court was concerned with the safety implications involved in allowing the testing. Whether or not those concerns continued, Chaney still must establish that his constitutional rights were violated. Chaney presents two arguments to establish that they were. First, he relies on the Supreme Court's decision in *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). *Ake* held that a state must provide indigent criminal defendants with expert psychiatric assistance if the defendant's mental condition is a significant factor at trial to satisfy Fourteenth Amendment due process requirements. *See id.* at 83, 105 S.Ct. 1087. But *Ake* was not the law when Chaney was convicted and as such is a "new rule" that cannot be applied on collateral review under *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).[3] While *Teague* does recognize certain exceptions, none apply here.

 Second, Chaney argues that Arizona has created a liberty interest in the provision of state-paid psychiatric assistance to indigent criminal defendants in the sentencing phase. Ariz.Rev.Stat. 13–4013(B) provides:

> When a person is charged with a capital offense the court . . . shall upon application of the defendant and a showing that the defendant is financially unable to pay for such services, appoint such . . . expert witnesses as are reasonably necessary adequately to present his defense at trial and at any subsequent proceeding.

Chaney argues that the word "shall" creates a due process liberty interest in the experts he sought for the sentencing phase of his murder trial. A "negative implication from mandatory language" in a statute does not necessarily create a protected interest. *Sandin v. Conner,* 515 U.S. 472, 483–84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (disapproving of *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)). State law may create a liberty interest when it protects an individual against arbitrary action of government. *See Wolff v. McDonnell,* 418 U.S.

539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Picray v. Sealock,* 138 F.3d 767, 770 (9th Cir.1998). Procedural requirements do not create a liberty interest unless they cause a "significant substantive reduction" in decision-making, *see Goodisman v. Lytle,* 724 F.2d 818, 820 (9th Cir.1984), or create an imperative that mandates action unless certain clearly-defined exceptions are found to apply, *see Baumann v. Arizona Dep't of Corrections,* 754 F.2d 841, 844 (9th Cir.1985) (noting that the Ninth Circuit endorses a restrictive interpretation of *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979)).

Chaney argues that the appointment of experts in capital cases is mandatory in Arizona, citing *Arizona v. Tison,* 129 Ariz. 526, 633 P.2d 335 (1981), *cert. denied,* 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982). *Tison* upheld the denial of a defense request for the appointment of an expert to conduct a public opinion survey to assist in jury selection in a highly publicized criminal trial, but noted that "constitutional considerations" might mandate the appointment of an expert whose findings might have some bearing on the ultimate question of guilt or innocence. *See id.* at 342.

Arizona cases discussing the meaning of Section 13–4013(B), however, do not suggest that appointment and expenditure is mandatory. *See, e.g., Arizona v. Clabourne,* 142 Ariz. 335, 690 P.2d 54, 61 (1984); *Arizona v. Gretzler,* 126 Ariz. 60, 612 P.2d 1023, 1053 (1980). To the contrary, they hold the trial court has broad discretion to determine whether reasonable necessity has been demonstrated. *See Arizona v. Williams,* 183 Ariz. 368, 904 P.2d 437, 450 (1995) (abuse of discretion only if denial of appointment substantially prejudiced the defendant); *Clabourne,* 690 P.2d at 61 (same).

 We do not have this case on direct review to determine whether the trial court should have appointed the defense-requested experts during either the guilt or sentencing

---

**3.** Chaney's conviction was final for *Teague* purposes in July 1984 when the Arizona Supreme Court affirmed his conviction and death sentence. *See Snook v. Wood,* 89 F.3d 605, 612 (9th Cir.1996).

phases. Even if there were error in the guilt phase, it was harmless as Chaney was able to call the requested experts. The failure to appoint at the sentencing phase is, to be sure, more problematic—but to prevail on his habeas petition, Chaney must show that he had a liberty interest in the appointment of the sought experts. That, in turn, requires a showing that the discretion of Arizona courts to appoint such experts is significantly reduced in a substantive manner or eliminated if certain exceptions do not apply.[4]

Appellant's Motion to Stay Proceedings is denied as moot.

AFFIRMED.

REINHARDT, Circuit Judge, concurring and dissenting:

The majority affirms Anthony Lee Chaney's conviction and sentence of death notwithstanding that the trial court's refusal to appoint expert witnesses essential to the presentation of his defense deprived him of due process of law at the sentencing phase of his trial, if not at both phases. In fact, the majority does not deny that the witnesses were essential with respect to the sentencing phase. Rather, it concludes that even though the Arizona statute may require the appointment of expert psychiatric witnesses for capital defendants who seek to establish an impaired mental condition, the state statute does not create a liberty interest. In so holding, the majority ignores this circuit's precedent regarding state-created liberty interests, disregards entirely the language of the state statute, and fails even to mention the state's admission in a contemporaneous case that the statute does create a liberty interest.

The trial court's denial of Chaney's request for expert assistance severely impaired his ability to present his side of the case. At the guilt phase, Chaney sought to prove an insanity defense; at sentencing, a critical mitigating circumstance—that his mental capacity was significantly impaired. Neither of these showings could be made without adequate testimony from the experts Chaney sought unsuccessfully to have appointed. The trial court's error will result in the execution of a man who may well suffer from a severe, though rare, neurological disease that would unquestionably constitute a mitigating circumstance under the Arizona death penalty statute. Because the tests and medical examinations that Chaney requested were not conducted, and thus not evaluated, by the two doctors he sought to have appointed as expert witnesses, we will never learn whether he is afflicted with the condition he claims—one that could affect his ability to control his behavior. Under these circumstances, Chaney was, at the least, deprived of a fair hearing at the penalty phase, and the imposition of his sentence of death was unconstitutional.

In my opinion, the trial court's obligation under the Arizona statute and the United States Constitution was clear. The Arizona statute gave Chaney, and all capital defendants, a right to an effective defense by means of "reasonably necessary" expert witnesses. The trial judge was under a mandatory duty to implement that right by appointing qualified experts who met that criterion. He refused to do so. While I concur in the majority's determination that Chaney is not entitled to relief on his remaining claims (though not with the manner in which the majority sets forth its conclusions), I would hold that Chaney's argument regarding the court's refusal to provide him with the assistance of expert witnesses is correct. Never-

4. *See Williams*, 904 P.2d at 450 ("[T]he trial court should exercise its discretion in favor of an examination when it finds that it needs more information to determine whether a mitigating factor might exist.... However, the rule is discretionary...."); *Clabourne*, 690 P.2d at 61 ("Whether additional experts are reasonably necessary is a decision within the sound discretion of the trial court."); *Arizona v. Greenawalt*, 128 Ariz. 150, 624 P.2d 828, 833–34 (1981) ("The determination of what expenditures are reason- ably necessary to enable the defendant to present an adequate defense is within the sound discretion of the trial court."); *Gretzler*, 612 P.2d at 1053 ("[The statute] is not to be construed as mandating, in every case, an appointment of investigators or experts, nor the expenditure of public money for their use, merely upon application.... This determination ... rests in the sound discretion of the trial court.") (internal quotations omitted). These cases, not a concession made in a separate case, control the interpretation of the statute at issue.

theless, and although I still have some doubt on the point, I concur in the majority's holding that the error was harmless as to the guilt phase. I have no doubt, however, that the error with respect to the sentencing phase was prejudicial and that the imposition of the death sentence violated Chaney's right to due process.

## I.

*The Nature of Liberty Interests*

The fundamental legal issue in this case-an issue that now unfortunately overshadows the fact that Chaney committed a reprehensible act that must be dealt with appropriately under the law-is best understood by reviewing the majority's discussion of the sentencing phase. The majority does not deny that the trial judge erred in refusing Chaney's request for expert psychiatric witnesses for purposes of the sentencing proceeding. Nor does it deny that as a result of that decision Chaney was deprived of a due process right that would have afforded him a fair opportunity to show that he should not be executed. *See Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (announcing that a criminal defendant has a constitutional right to the assistance of a competent psychiatrist in preparation for his defense, if his sanity is likely to be a significant factor at trial). As to the direct due process violation, the majority says, however, that because "the law" had not yet "recognized" the constitutional right involved when Chaney was convicted, he is barred from asserting it. *See Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Here, the majority is correct. Under the Supreme Court's *Teague* decision, we are required to disregard the fact that Chaney's constitutional rights acknowledged in *Ake* were violated. However, Chaney's right to expert psychiatric witnesses was not only guaranteed directly (though not yet recognized) by the due process clause of the United States Constitution, but it was independently guaranteed by a statute enacted by the state of Arizona. Under the Constitution, state statutory laws designed to assure fairness and protect the substantive rights of defendants in capital punishment cases create liberty interests, and thus give rise to indirect due process rights. *See Fetterly v. Paskett,* 997 F.2d 1295, 1300–01 (9th Cir.1993). This, too, the majority does not deny. It refuses to vacate Chaney's death sentence for one reason only. It concludes that because the Arizona statute provides capital defendants with the right to "reasonably necessary" expert witnesses, rather than to *all* expert witnesses a defendant may request, the Arizona law does not create a liberty interest.

It is the fact that a judge must decide whether particular witnesses are "reasonably necessary" that causes the majority to conclude that capital defendants have no liberty interest in having expert witnesses appointed, no matter how essential they may be to a defendant's case. It is the fact that the trial judge must make a threshold decision as to whether the particular request for appointment of an expert witness meets the modest statutory standard that, in the majority's view, strips defendants of the liberty interest Arizona law would otherwise provide. In short, it is because the judge's decision involves a limited exercise of discretion that the majority believes that no constitutional protection is afforded by the statute. It is here that I part company with my colleagues.

In my opinion, the majority simply misconceives the nature of liberty interests in our constitutional jurisprudence. It also wholly ignores this court's precedent, *see, e.g., Oviatt By and Through Waugh v. Pearce,* 954 F.2d 1470, 1474 (9th Cir.1992), discussed *infra,* pp. 929–30, as well as the language of the Arizona statute. Contrary to the majority's view, a state-created liberty interest *can* exist even when the judge must determine the statute's applicability in a particular case. It *does* exist when, as here, the statute provides that the court is under a mandatory duty to act once it determines that a capital defendant's request has met a qualifying criterion. It exists, in short, even when the judge must exercise discretion, if that discretion is statutorily circumscribed. As this court has made clear on several previous occasions, a statute creates a liberty interest if the discretion of the decisionmaker is limited by substantive predicates and if the statute uses mandatory language in specifying

the outcome. *See, e.g., Bonin v. Calderon,* 59 F.3d 815, 842 (9th Cir.1995); *Oviatt,* 954 F.2d at 1474. That is precisely the case here.

## II.

*Section 13–4013(B) Creates a Liberty Interest*

### A. The Nature of the Statute

Section 13–4013(B) states that "[w]hen a person is charged with a capital offense, the court may on its own initiative and *shall* upon application of the [indigent] defendant ... appoint such ... expert witnesses as are *reasonably necessary* adequately to present his defense at trial and at any subsequent proceeding." Ariz.Rev.Stat. § 13–4013(B) (emphasis added). The plain language of the statute clearly establishes a non-discretionary entitlement for indigent capital defendants to the assistance of "reasonably necessary" experts. Section 13–4013(B) states that the court "*shall*" appoint expert witnesses. The statute thus uses mandatory language and clearly specifies the outcome to be reached-the appointment of expert witnesses.[1] In addition, the decision-maker's discretion is limited. The "reasonably necessary adequately to present his defense" language sets forth the substantive predicate that circumscribes the trial court's discretion. The statute therefore meets the require-ments we have described for the creation of a liberty interest. *See Bonin,* 59 F.3d at 842 ("In order to create a liberty interest protected by due process, the state law must contain: (1) substantive predicates governing official decisionmaking, and (2) explicitly mandatory language specifying the outcome that must be reached if the substantive predicates have been met.") (internal quotations and citations omitted).

The majority opinion does not dispute that if the statute is "mandatory," it creates a liberty interest. Nor does the majority deny that Chaney is entitled to the vacation of his sentence if a liberty interest exists. Rather, the majority's argument is simply that no liberty interest exists because the statute does not "mandate" the appointment of expert witnesses. It is true that, as the majority suggests, there may be room for disagreement as to whether a particular expert witness is reasonably necessary in a particular case, and that the determination of that question requires the exercise of some discretion by the trial judge. However, the critical fact is that, under the Arizona statute, when a witness is "reasonably necessary" to the presentation of a defense in a capital case, the defendant is *entitled* to his appointment. In that crucial respect, the court's ordinary discretion regarding the services of expert witnesses is significantly circumscribed, and the court does not possess

---

1. The mandatory language of § 13–4013(B) contrasts sharply with the broad discretionary language of 17 A.R.S. Rules of Criminal Procedure, Rule 11, which governs the appointment of experts for a mental competency determination and with A.R.S. § 13–605, which governs the commitment of a defendant for the performance of a psychiatric evaluation for sentencing purposes. Rule 11.2 states, in relevant part:

 a. Motion for Rule 11 Examination: At any time after an information or complaint is filed or indictment returned, any party may request in writing, or the court on its own motion *may order,* an examination to determine whether a defendant is competent to stand trial ... On the motion of or with the consent of the defendant, the court *may order* a screening examination for a guilty except insane plea ... to be conducted by a mental health expert.

 . . . . .

 c. Preliminary examination. The court *may order* that a preliminary examination be conducted ...

 17 Ariz.Rev.Stat. Rules of Criminal Procedure, Rule 11 (emphasis added). A.R.S. § 13–605 states, in relevant part:

 A. If after presentence investigation, the court *desires* more detailed information as a basis for determining the sentence to be imposed, it *may* commit the defendant ...

 B. If after presentence investigation the court *desires* more detailed information about the defendant's mental condition, it *may* commit or refer the defendant ...

 C. In an appropriate case the court *in its discretion may* order diagnostic commitments under both subsections A and B ...

 Ariz.Rev.Stat. § 13–605 (emphasis added).

the broad discretion it otherwise enjoys with respect to the appointment of expert witnesses.[2] To the contrary, the statute imposes an absolute duty on the court to appoint expert witnesses who are "reasonably necessary." *See State v. Eastlack*, 180 Ariz. 243, 883 P.2d 999, 1016 (1994) (holding that an "indigent defendant in a capital case has an absolute right to the help of expert witnesses"). Thus, it is the right to "reasonably necessary" witnesses that the law establishes, and it is that statutory right that creates the liberty interest.

## B. The Applicable Federal Law

The majority's purported discussion of the question of state-created liberty interests is almost bereft of federal law. After grudgingly acknowledging in one brief sentence that such a category of constitutional rights exists, it mentions only two federal cases, without ever discussing their relevance. The entirety of the majority's analysis of the relevant federal law consists of the following:

"Procedural requirements do not create a liberty interest unless they cause a 'significant substantive reduction' in decisionmaking, *see Goodisman v. Lytle*, 724 F.2d 818, 820 (9th Cir.1984), or create an imperative that mandates action unless certain clearly-defined exceptions are found to apply, *see Baumann v. Arizona Dep't of Corrections*, 754 F.2d 841, 844 (9th Cir.1985) (noting that the Ninth Circuit endorses a restrictive interpretation of *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 99 S.Ct.

2100, 60 L.Ed.2d 668 (1979)." (majority at 925–26).

*Goodisman v. Lytle*, 724 F.2d 818 (9th Cir.1984), the first of the two federal cases cited by the majority, does not support the majority's arguments. To the contrary, *Goodisman* fully supports Chaney's position. *Goodisman* requires only that the statute impose a "significant substantive reduction" in the discretion of the decisionmaker. *Id.* at 820.[3] The "significant substantive reduction" or "substantive limitation" standard is the standard that has been applied by federal courts in most liberty interest cases. *See Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) ("State creates a protected liberty interest by placing substantive limitations on official discretion."); *Oviatt*, 954 F.2d at 1474 (quoting *Olim* and applying same standard). Unfortunately, the majority fails to examine the Arizona statute under the *Goodisman* standard. Instead, it simply recites the standard and stops there. Were my colleagues to apply the law to the facts, they would be required to hold that § 13–4013(B) meets the *Goodisman* criterion. Section 13–4013(B) clearly imposes a "significant substantive reduction" in, or "substantive limitations" on, the court's discretion. Under § 13–4013(B), the trial judge is not free to exercise his ordinary discretion regarding expert witnesses, *see* nn. 1 and 2 *supra*, but *must* appoint such witnesses, both at trial and at the sentencing phase, when they are "reasonably necessary" to the capital defendant's case. That is clearly a significant substantive reduction in the court's otherwise unlimited discretion.[4]

**2.** The contrast is made dramatically clear by comparing not only the Arizona statutes and rules set forth in n. 1, *supra*, but also Arizona Rules of Evidence, Rule 706:

> Appointment of experts by the court is subject to the availability of funds … The court *may* … enter an order to show cause why expert witnesses should not be appointed … The court *may* appoint any expert witnesses agreed upon by the parties, and *may* appoint expert witnesses of its own selection.

Ariz.Rev.Stat., Arizona Rules of Evidence, Rule 706 (emphasis added); *see also supra* n. 1.

**3.** *Goodisman* involved the tenure process at the University of Washington. We held that a nontenured professor had no liberty interest in obtaining tenure because "no significant substan-

tive limitations" had been placed on the University officials' discretion to make tenure decisions.

**4.** The other federal case the majority cites in support of its holding also does not provide it any succor. In *Baumann v. Arizona Dep't of Corrections*, 754 F.2d 841 (9th Cir.1985), we analyzed in some detail the applicability of state liberty interest law to the specific problem of prison release complaints. Even in the prison context (*see* n. 5, *infra*), the standard we employed was similar to the *Goodisman* standard, and thus supports Chaney's position. I might point out, moreover, that the total discretion given the prison director to implement the prison regulations considered in *Baumann* provides a clear and direct contrast with the circumscribed discretion

The majority fails to mention *any* of the cases in which this court and other circuit courts have found that state statutes created liberty interests even though they provide for the exercise of discretion on the part of the decisionmaker. For example, in *Oviatt By and Through Waugh v. Pearce*, 954 F.2d 1470 (9th Cir.1992), we concluded that an Oregon statute created a liberty interest in arraignment within a 36–hour period despite the fact that the statute granted the state authorities the discretion not to arraign defendants within that period if they determined that "good cause" existed for not doing so. *Id.* at 1475. The discretion afforded the authorities by state law in *Oviatt* is at least as great as the discretion that the Arizona statute at issue here bestows upon trial courts when a defendant requests the appointment of experts to assist him in a capital case.[5] Both state statutes require a preliminary determination as to whether the defendant is entitled to the prescribed right, and both establish the particular right absolutely once the appropriate determination is made.

At least two other circuits have also identified state-created liberty interests when the state statutes in question require the exercise of discretion on the part of the decisionmaker. For example, in *Taylor By and Through Walker v. Ledbetter*, 818 F.2d 791, 799 (11th Cir.1987), the court identified a liberty interest in Georgia statutes that mandate strict procedural protections for children in foster care, despite the fact that several of the provisions afford substantial discretion to the state officials (for example, one required visits to foster homes as "frequently as necessary," and another required assessments of the "child's total needs"). Also, in *Rogers v. Okin*, 738 F.2d 1, 7 (1st Cir.1984), the court held that several administrative provisions governing the care of mental patients created liberty interests, announcing that they used "language of an unmistakably mandatory character" and established "substantive predicates" to limit discretion. But many of those provisions, such as the one authorizing the administration of drugs only if a patient posed an "imminent threat" and only if "no less intrusive alternative" existed, required the exercise of discretion by a decisionmaker. *Id.* at 6–7. As in *Oviatt*, the courts in *Rogers* and *Taylor* recognized that the statutes created liberty interests despite the need for the exercise of discretion in implementing the substantive obligations the statutes imposed. What these cases required in order to find a liberty interest was that the decisionmaker's ordinary discretion be significantly limited. The majority opinion simply cannot be reconciled with the rule of law applied in these cases.[6]

---

afforded the trial judge by the statute before us. In *Baumann*, we emphasized that "Policy Statement No. 432 provides specifically that the grant of a furlough is 'at the sole discretion of the Director in accordance with [the] procedures.'" *Id.* at 845.

5. The Oregon statute that we concluded creates a liberty interest states, in relevant part: "Except for good cause shown ... if the defendant is in custody, the arraignment shall be held during the first 36 hours of custody." Or.Rev.Stat. § 135.010.

6. The majority's reliance on *Sandin v. Conner*, 515 U.S. 472, 483–84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), may explain in part its misconception of the requirements for finding a liberty interest and its mistaken view that there can be no such interest if a decisionmaker retains discretionary authority in connection with the implementation of a state-created right. In *Sandin*, the Court explicitly limited its holding to the context of prison regulations. The majority cites *Sandin* for the proposition that a "negative impli-

cation from mandatory language in a statute does not necessarily create a protected liberty interest." (majority at 10708) (internal citations and quotations omitted). The iteration of this proposition is mystifying, since Chaney does not ask us to rely on any negative implication. In any event, in quoting selectively from the *Sandin* sentence, the majority excludes the language that limits the Court's holding: "the search for a negative implication from mandatory language *in prisoner regulations* has strayed from the real concerns undergirding the liberty protected by the Due Process Clause." *Sandin*, 515 U.S. at 483, 115 S.Ct. 2293 (emphasis added). The Court then specifically contrasted the rule applicable in prison regulation cases with the rule applicable to liberty interests created by state statutes. The Court noted that the rule it was rejecting in *Sandin* "may be entirely sensible in the ordinary task of construing a statute defining rights and remedies available to the general public. It is a good deal less sensible in the case of a prison regulation primarily designed to guide correctional officials in the administration of a prison." *Id.* at 481–82, 115 S.Ct. 2293. In pris-

## C. The Applicable State Law

The majority not only fails to consider the applicable federal law, including the law of our circuit, it also fails to examine the language of the Arizona statute. Instead, it relies almost exclusively on string-cites to several Arizona decisions that purportedly minimize the trial court's statutory obligations. This effort is wholly unsuccessful. The Arizona Supreme Court has never stated, as the majority contends, that the trial court has "broad discretion" to decline to appoint expert witnesses in capital punishment cases.[7] It has never suggested that the obligation to appoint such experts when reasonably necessary to provide capital defendants with an adequate defense is not a significant substantive limitation on the ordinary discretion of the trial judge. In fact, the Arizona Supreme Court has never denied what is apparent from the words of the statute-that § 13–4013(B) gives rise to a liberty interest. To the contrary, Arizona's highest court has stated, as Chaney points out, that, under the statute, a capital defendant has an absolute right to "reasonably necessary" expert witnesses.[8]

on cases, as *Sandin* points out, courts are extremely reluctant to review discretionary acts by correctional officials. *Id.* In those cases, we find liberty interests only when the prison regulations unequivocally establish the particular right in question. When a "statute defining rights and remedies available" to others is at issue, however, we view the problem from a more relaxed and common-sense perspective. *Id.* at 481, 115 S.Ct. 2293.

On at least three other occasions, this court has suggested that *Sandin*'s holding is limited to the prison context. *See Picray v. Sealock*, 138 F.3d 767 (9th Cir.1998) (announcing that while *Sandin* substantially narrowed the doctrine of state-created liberty interests for prisoner cases, "in other contexts a state statute can create a liberty interest protected by the due process clause"); *Carlo v. Chino*, 105 F.3d 493, 498 (9th Cir.1997) (announcing that "*Sandin* arose in the context of disciplinary segregation of a convicted prisoner" and "[t]herefore, the *Sandin* test appears to apply specifically to prisoners who have been convicted"); *Mitchell v. Dupnik*, 75 F.3d 517, 524 (9th Cir.1996) ("*Sandin* ... recognizes that its rationale regarding incarcerated prisoners is not applicable to pretrial detainees").

**7.** The majority cites four Arizona cases to support its thesis that under § 13–4013(B) "the trial court has broad discretion to determine whether reasonable necessity has been demonstrated." (majority at 10709). All fail to support this overstatement. In *Arizona v. Williams*, 183 Ariz. 368, 904 P.2d 437, 450 (1995), nothing was said about "broad" discretion. Rather the Supreme Court found no basis in the record to suggest that any question existed as to the defendant's mental health. It said that an abuse of discretion occurs when an additional mental health examination might produce "additional evidence supporting mitigation," but that no such showing had been made by Williams. *Id.* In *Arizona v. Clabourne*, 142 Ariz. 335, 690 P.2d 54, 61 (1984), although it is difficult to be certain from the skeletal facts that are reported, it appears that the defendant failed to make even a colorable showing of reasonable necessity. He apparently made only a general request that additional psychiatrists be appointed without designating which experts he sought appointment of, or how any further examinations might differ from those already conducted. *Id.* at 61–62. As to discretion, the court referred only to the trial court's "sound discretion." *Id.* at 61. In *Arizona v. Greenawalt*, 128 Ariz. 150, 624 P.2d 828, 833–34 (1981), the issue was whether the court could properly require defense counsel to make a showing of reasonable necessity as to specific areas of investigation before authorizing the use of state funds for the defense investigator's services, or whether it was compelled to make one blanket authorization of such services in advance. The question did *not* involve the appointment of *expert witnesses.* (A separate issue was raised in *Greenawalt* as to the appointment of an expert witness for public opinion polling, but the Arizona Supreme Court had already held such an appointment to be beyond the scope of the statute.) Indeed, the *Greenawalt* trial judge never denied a request for investigator's services or refused to authorize such services as to any area of inquiry. The Arizona Supreme Court, citing the trial judge's "sound discretion," held only that requiring a showing of reasonable necessity on an issue by issue basis was appropriate and that Greenawalt was not denied "*due process of law.*" *Id.* at 834. In *Arizona v. Gretzler*, 126 Ariz. 60, 612 P.2d 1023, 1053 (1980), the court concluded that Gretzler did not meet the conditions of the Arizona statute, in part because after the trial court granted him funds to contact the expert he had chosen, the expert advised him that no further examination would be necessary, and his lawyer failed to make any further request of the court. In *Gretzler*, as in all the other cases cited by the majority, the court did not make any statement that a trial court has "broad" discretion to deny expert assistance. *Id.*

**8.** In *State v. Eastlack*, 180 Ariz. 243, 883 P.2d 999, 1016 (1994), the court held that an "indigent defendant in a capital case has an *absolute right* to the help of expert witnesses" (emphasis added). *See also, State v. Tison*, 129 Ariz. 526, 633 P.2d 335, 342 (1981) *cert. denied*, 459 U.S.

## D. The Statute in Operation

Contrary to the majority's assertions, Chaney's argument is not that § 13–4013(B) furnishes an absolute right to expert assistance in all cases and without regard to need. Rather, as Chaney properly recognizes, the statute explicitly conditions court appointment of expert witnesses on the existence of a reasonable necessity for the expert's services. All that Chaney asserts is that where such expert assistance *is* "reasonably necessary" to a capital defendant's presentation of his defense, the court *must* ("shall") authorize such assistance, and that, in such a circumstance, the court has an unqualified obligation to do so. That, argues Chaney, gives rise to a liberty interest, under the applicable law. Chaney is correct.

The purpose of the Arizona statute is to ensure that defendants charged with capital offenses receive whatever assistance from expert witnesses is reasonably necessary to enable them to present an adequate defense. In providing special assurance that capital defendants receive such a defense, § 13–4013(B) is in line with other state statutes designed to ensure accuracy and fairness before a sentence of death is imposed. *See Fetterly v. Paskett*, 997 F.2d 1295, 1300–01 (9th Cir.1993) (finding state-created liberty interest in the state-created requirement that the trial judge employ a particular method of balancing aggravating and mitigating circumstances before a death sentence may be imposed).[9] By its plain language, Arizona's § 13–4013(B) makes the appointment of experts in capital cases mandatory whenever they are important to the capital defendant's case. Such language establishes a state-created liberty interest.[10]

## E. The State's Concession

The majority does not discuss our decision in *Gretzler v. Stewart*, 112 F.3d 992 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 865, 139 L.Ed.2d 763 (1998), in which we asserted that § 13–4013(B) creates a protected liberty interest. We did so on the basis of the express acknowledgment by the Attorney General of Arizona *"that the mandatory language of section 4013(B) creates a protected liberty interest and that due process requires its fulfillment." Id.* at 1000. Because of the state's representation, we said that the only issue was whether the judge had complied with the statute-whether Gretzler had received the due process to which he was entitled. We then upheld the trial court's determination that the expert Gretzler sought was not "reasonably necessary," and concluded that the trial court's actions "complied with the requirements of Ariz.Rev. Stat. § 13–4013(B) and did not constitute a denial of due process." *Id.* at 1002.[11]

In *Gretzler*, Arizona did not ask us to *assume* that the statute created a liberty interest. It *represented* to this court that

---

882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982), in which the court stated that § 13–4013(B) "provides for the appointment of experts" that are "reasonably necessary." *Tison* makes no reference to any "broad" discretion in the trial court to refuse to make such appointments.

**9.** The statute we consider here stands in direct contrast to the state rule we examined in *Bonin v. Calderon*, 59 F.3d 815, 841–42 (9th Cir.1995). There, we declined to find a state-created liberty interest because we concluded that there was only a procedural rule, rather than a substantive right, at stake. *Id.* Here, the majority does not dispute that the right conferred by the Arizona statute is substantive. The right is, simply, that of a capital defendant "adequately to present his defense."

**10.** There is nothing inconsistent about the fact that a trial judge retains the limited discretion to determine whether in a particular case the appointment of a particular expert witness is necessary. Certainly, there will be no necessity for an additional appointment if other psychiatric witnesses have already been appointed to aid the defense and the testimony would be cumulative, or if the proposed witness is determined not to be an expert with respect to the specific issue, or even if the defense is determined to be frivolous or not bona fide. This is the kind of circumscribed discretion that may be exercised by a decision-maker when a liberty interest exists. *See Oviatt*, 954 F.2d at 1474.

**11.** The reason the state court in *Gretzler* found the appointment not "reasonably necessary" was that it held that the defense had failed to make a preliminary showing that it was reasonably likely that Gretzler's sanity would be in issue at trial. The trial judge offered defense counsel the opportunity to consult with a doctor and report back, reserving ruling as to whether further mental examinations would be conducted. Defense counsel never reported back or made a further request. *Gretzler*, 112 F.3d at 1000–01.

the statute did so. Arizona filed its briefs with this court in *Gretzler* on March 27, 1996 and in this case on August 27, 1996. Within five months, without suggesting that any change in the law had occurred and without offering any explanation for its actions, Arizona took directly contradictory positions before this court as to the effect of its statute.

In capital cases, at least, such conduct by the state is wholly unacceptable. Given the performance of Arizona's Attorney General, we cannot have much confidence in his assertions regarding the law or the facts. I would, if necessary, apply the rule of judicial estoppel that we invoked in *Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir.1990), when we barred the state of Washington from taking advantage of an inconsistent argument. We need not go that far here, however. All we need do is afford our own precedent the dignity to which it is entitled. On the basis of Arizona's representation in *Gretzler,* we construed § 13–4013(B) as creating a liberty interest only a few months ago. We should apply that precedent here.

### F. Summary

I conclude that § 13–4013(B) provides a liberty interest to capital defendants. It assures that at their trial they will be able to present witnesses who are necessary to their defense. It also ensures that capital defendants will have a fair opportunity to establish a statutory mitigating factor by offering essential evidence of their mental condition at the capital punishment phase. These are important rights indeed that the state has afforded to persons who face the possibility of execution. The fact that a trial court must exercise some discretion in order to determine that the particular experts requested are important to the defense of the case before it prior to authorizing their appointment in no way means that the statute fails to meet the requirements for establishing a liberty interest. To the contrary, the controlling fact is that the discretion the court would ordinarily possess is significantly limited by the mandate contained in the Arizona statute. As we stated in *Oviatt By and Through Waugh v. Pearce,* 954 F.2d 1470, 1474 (9th Cir.1992) (see discussion *supra,* at pp. 929–30), a statute creates a liberty interest if it contains substantive predicates governing an official's decision and uses mandatory language to specify the outcome that must be reached. Those conditions are unquestionably met here.

### III.

*Chaney's Guilt Phase Claim*

I have serious doubt regarding the majority's conclusion (apparently based on an unexpressed assumption *arguendo* that the statute *does* create a liberty interest) that the trial court's denial of Chaney's motion was harmless error with respect to the guilt phase. There is little question that the trial court violated § 13–4013(B) when it denied Chaney's pretrial motion. The requested expert assistance was essential to Chaney's defense of insanity. The remaining issue, however, is whether the failure to appoint the experts was prejudicial.

I should point out initially that the trial court's reasons for denying Chaney's request at the guilt phase were arbitrary. Its explanation that the "administration of said tests presents substantial security problems" is flatly contradicted by its order issued on the same day requiring Chaney to "make himself available to counsel for the State for whatever examinations said attorneys feel necessary to rebut the evidence to be presented by the defendant." The trial court placed no restrictions whatsoever on the government's examination and made no mention of any security problems that the prosecution's testing of Chaney might present. Moreover, if there was no legitimate basis for Chaney's defense that he suffered from a brain disease, as the trial court apparently concluded, there was no reason for it to decide that the prosecution needed *additional* experts to refute that claim. In short, the trial court's decision to give the state complete freedom to test Chaney belies its justification for denying his motion on the ground that it would pose a security problem; equally important, the court's authorization of even more psychiatric experts to bolster the prosecution's case while denying *all* experts to the defense in itself demonstrates the arbitrariness and unreasonableness of the court's actions.

Furthermore, the trial court imposed an altogether improper burden on the defendant to present *actual medical testimony* that he suffered from organic brain disease when the proper standard requires only that he make a *minimal showing of reasonable necessity.* State v. Williams, 166 Ariz. 132, 800 P.2d 1240, 1247 (1987). The statute does not require that a medical expert actually testify or provide a sworn affidavit. The defendant's attorney only needs to articulate, either by affidavit or orally, the specific reasons why the experts and testing are necessary. *Id.* Here, the trial court disregarded Chaney's attorney's statement that he had received a preliminary assessment from Dr. Ervin that Chaney was likely suffering from organic brain disease. Instead, the trial court concluded that there was no reasonable basis for Chaney's request and denied it.

Unquestionably the error seriously impaired Chaney's ability to present his defense. In reaching its decision to the contrary, the majority points out that Chaney's two experts actually testified at trial, that they testified unpersuasively, and that they were contradicted by the state's experts. What the majority does not consider, however, is the fact that the trial court's refusal to appoint the two doctors as expert witnesses made it impossible for Chaney to obtain their services in time for them to do the work required to prepare for trial. Although Drs. Ervin and Alexander testified, they had arrived in the state only one day before trial, did not have the opportunity to review many of the relevant reports and documented interviews with Chaney and other witnesses, and had no opportunity to conduct tests they believed to be essential. Nor did either of Chaney's experts have time to prepare a report of his findings and conclusions as the state's expert witnesses had. These deficiencies seriously weakened their ability to testify persuasively regarding Chaney's mental condition. The two medical experts were simply not in a position to afford Chaney the defense to which he was entitled. On cross-examination the prosecutor attacked the experts' testimony by pointing out that they had not interviewed certain individuals and had not reviewed all the available materials. One of Chaney's experts conceded repeatedly

that without further testing he could only provide preliminary recommendations. The other expert testified with greater certainty but conceded that he was required to review several hundred reports and test results within a single day, and even had to lie down due to exhaustion. On cross-examination the prosecutor persuasively argued that this second expert had misinterpreted the EEG results. Under the circumstances, it is not surprising that the pair failed to impress the jury; the only surprise was that they were able to offer any testimony at all.

In the end, the testimony of Chaney's two volunteer experts probably did him more harm than good. Being unable to conduct the proper tests and to prepare for trial adequately, they could not properly assist him in his defense and their testimony was made to appear incredible. The trial court's error severely impaired Chaney's ability to present his defense.

Notwithstanding the above, I do not believe that any testimony the medical experts could have offered would, even under the most favorable of circumstances, have provided a basis for Chaney's acquittal or his conviction on a lesser charge. For, such a result would have required Chaney to show not only that the disputed mental impairment existed, but also that there was a sufficient causal connection between that impairment and the commission of the murder of which Chaney was convicted. I do not think it likely that a reasonable jury would have drawn the necessary inferences. Accordingly, while I have reservations about my conclusion, I will not dissent from the majority's holding as to the guilt phase.

### IV.

*Chaney's Sentencing Phase Claim*

With regard to the denial of Chaney's right to expert assistance for the sentencing phase, the majority acknowledges that "the failure to appoint [experts] at the sentencing phase is, to be sure, more problematic." (majority at 925). In fact, the majority does not dispute that if a liberty interest exists, Chaney's constitutional rights were violated and the sentence must be vacated. The majority's

entire argument on the sentencing phase may be reduced to three sentences: 1) Chaney argues that the statute requires the appointment of experts. 2) The statute does not mandate such appointments; rather appointments are discretionary. 3) Accordingly, no liberty interest exists.

I have already discussed at length the legal deficiencies in this argument in Section II, *supra,* but a few points are worth emphasizing. By refusing Chaney's request for expert assistance at sentencing, the court denied him the opportunity to present critical evidence essential to showing the existence of a mitigating circumstance. This error was egregious. Section 13–703 of the Arizona Criminal Code states that the defendant may introduce "*any information relevant* to any mitigating circumstances" regardless of its admissibility under evidentiary rules. Ariz. Rev.Stat. § 13–703(C) (emphasis added).[12] An impairment to the defendant's mental capacity is a mitigating circumstance under Arizona law. Ariz.Rev.Stat. § 13–703(G). Evidence that Chaney suffers from a form of brain damage would constitute mitigating evidence, even if the testimony would be insufficient to establish an insanity defense at trial. *Jeffers v. Lewis,* 38 F.3d 411, 417 (9th Cir.1994). These considerations led the Arizona Supreme Court, while considering precisely this type of sentencing claim, to characterize the defendant's right to experts as "*absolute.*" *State v. Eastlack,* 180 Ariz. 243, 883 P.2d 999, 1016 (1994) (emphasis added). Here, there is little doubt that a mitigating circumstance based on Chaney's mental condition represented his best chance to escape the death penalty. Thus, Chaney was entitled to the appointment of the requested experts to enable him to present the necessary defense.

As the majority has recognized, the trial court's excuses for its decision were unfounded: there was no legitimate security concern, and the request was made in a timely fashion. The trial court's recitation of its justifications demonstrates beyond doubt that it acted unreasonably and arbitrarily in denying Chaney's presentencing request. Thus, the question is whether in violating the Arizona statute, the trial court deprived Chaney of a constitutionally protected liberty interest. As explained in Section II, *supra,* under the law of this circuit, it did.

Finally, although the majority does not suggest that the error at the sentencing phase was harmless, I should point out clearly why it was not. One of the purposes of the mitigation phase of a capital punishment trial is to allow the defendant to show the existence of a mental impairment that is real but is insufficient to constitute a defense at the guilt phase. The court is required to weigh any such mitigating circumstance before deciding whether to impose a capital sentence. Mental impairment is indeed the first and most important mitigating circumstance listed in the Arizona capital punishment statute. Ariz.Rev.Stat. § 13–703(G)(1). We must presume that a sentencing judge would give considerable weight to the existence of any such circumstance. For that reason, I would not find harmless error when a capital defendant who may suffer from serious brain damage is erroneously precluded from showing the existence of that condition at his capital punishment hearing. *See Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion) (sentencer may "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death").

*Conclusion*

The majority's holding that A.R.S. § 13–4013(B) does not create a constitutionally-protected liberty interest is contrary to law. Chaney's execution will be in derogation of his due process rights. While the error with respect to the guilt phase of his trial may have been harmless, Chaney did not receive a fair sentencing hearing before the court imposed its sentence of capital punishment.

---

12. While § 13–703 dispenses with evidentiary rules for the admission of information relevant to mitigating circumstances, that section still requires that information relevant to "any of the aggravating circumstances ... shall be governed by the rules of evidence at criminal trials." A.R.S. § 13–703(C).

That error *was* prejudicial. Accordingly, I dissent from the part of the majority opinion that affirms Chaney's death sentence.